**Darlie Lynn ROUTIER, Appellant,**

v.

**The STATE of Texas.**

No. 72795.

Court of Criminal Appeals of Texas.

May 21, 2003.

Rehearing Denied Sept. 10, 2003.

J. Stephen Cooper, Dallas, for Appellant.

John R. Rolater, Jr., Asst. DA, Dallas, Matthew Paul, State's Attorney, Austin, for State.

PRICE, J., delivered the unanimous opinion of the Court.

The appellant was convicted of the capital murder of a child under six years of age. Tex. Penal Code § 19.03(a)(8). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. Tex.Code Crim. Proc. art. 37.071, § 2(g). Direct appeal to this Court is automatic. Tex.Code Crim. Proc. art. 37.071, § 2(h). The appellant raises fourteen points of error. We shall affirm.

The evidence that supports the verdict shows that the appellant stabbed and killed her two sons, Damon and Devon,[1] while her husband and infant son were asleep upstairs in the house. The appellant does not challenge the legal or factual sufficiency of the evidence to support her conviction, and therefore, it is not necessary to set out the evidence in detail.

## I. Claims Regarding the Record

In her brief, the appellant makes several claims regarding the preparation and certification of the reporter's record in addition to claims regarding her trial. We will address claims dealing with the accuracy of the record before dealing with the appellant's claims regarding her trial. Specifically, the appellant complains that she is entitled to a new trial because of problems with the reporter's record. She argues that, at a minimum, she is entitled to a hearing before the record can be used to decide her appeal. A review of the facts pertaining to these points of error is necessary.

The appellant's trial took place in January 1997. The certified court reporter, Sandra Halsey, took stenographic notes during the trial. Halsey simultaneously typed notes of the proceedings onto paper strips ("notes") and onto computer edit disks ("disks") that automatically translated the stenographic symbols into English. In April 1998, under an order of contempt issued by this Court the month before,[2] Halsey prepared, certified, and filed the original reporter's record in the case ("Halsey record").

In a motion to correct and clarify Halsey's record, filed October 13, 1998, the appellant raised the first dispute about the accuracy of the record. An excerpt of the record that had been read to the jury did not match the corresponding portion of the Halsey record. Also, counsel noted discrepancies about who was present during the trial and when. The next day this Court granted the appellant's motion and ordered Halsey to prepare, certify, and file a supplemental reporter's record containing any omitted items. We also ordered the trial court[3] to resolve any dispute raised in the appellant's motion and to

---

1. In this case, the State charged the appellant with the murder of Damon, a child under the age of six.

2. Halsey was late in preparing the record.

3. The trial judge who presided over the hearings regarding the record, Judge Robert Francis, is not the judge who presided over the trial on the merits. Judge Mark Tolle retired after the appellant's trial.

ensure that the reporter's record conformed to what occurred at trial.

The trial court conducted a hearing and decided that the entire record had to be reviewed to comply with this Court's October 14, 1998 order. In a hearing held October 30, 1998, pursuant to our order, Halsey testified that she made audiotape recordings ("tapes") in addition to the notes and disks during the trial. Halsey claimed that the audiotape recorder worked during only the voir dire portion of the trial. The trial court ordered Halsey to produce her notes, disks, and tapes from the trial. The trial court also ordered her to conduct a review of the record and make note of any problems she found or corrections she made.

At a hearing held on November 4, 1998, the trial court appointed three certified court reporters, Tommy Mullins, Judy Miller, and Jerry Calloway ("the experts"), to perform a review and to compare the notes and disks to Halsey's record to determine whether Halsey's record could be certified.

Although Halsey had told the trial court and the experts that she possessed no tapes from the guilt and punishment phases of the trial, on November 12, 1998, she told prosecutor Lindsey Roberts and appellant's counsel Stephen Cooper that tapes from those phases of the trial did exist. According to a stipulation read into the record, she went with Roberts to retrieve the tapes from a storage facility in Plano. Halsey told Roberts that the tapes she produced were from the Routier trial. These tapes were produced during the

hearing in the trial court on November 13, 1998. The appellant expressed concern about the authenticity of the tapes. The trial court received the tapes with the understanding that the question of their authenticity would be subject to further review.

Also during the hearing on November 13, the experts testified that they performed their review by comparing a total of twelve random pages from four of the ten volumes of Halsey's record of the trial with the corresponding notes and disks. On each of the four pages, the experts found several differences between what was in the notes and what was on the pages from the record. They concluded that the only way to account for so many differences between the notes and Halsey's record is that someone listened to tapes from the trial and made changes based on the tapes.[4]

Halsey's daughter and transcription scopist,[5] Suzy Crowley, testified that Halsey gave her tapes of the guilt and punishment phases of trial. Crowley stated that she used the tapes to make permanent changes to the English translation of the original proceedings on the disks. She testified that the tapes presented by Roberts looked similar to the ones she had used and that they had labels on them that identified them as being from the Routier trial. Scopist Michelle Reynolds reviewed and edited the voir dire portion of the trial.

Halsey did not testify at the hearing on November 13, 1998. The trial court ap-

---

4. Miller testified that she heard Halsey's reason that the tape recorder did not work during the appellant's trial: the recorder required a battery in the external microphone. Miller said that she had used the same type of equipment before and that the battery in the microphone improves the quality of the recording, but the recorder has an internal microphone that will pick up sound even if the external microphone does not have batteries.

5. A transcription scopist assists a court reporter in preparing the trial record. Testimony taken during the proceedings on the record indicated that the use of a scopist is a normal and necessary part of the process of producing a trial record.

pointed counsel for her. At the conclusion of the hearing, the trial court rescinded its prior order of October 30, 1998, to have Halsey review her record and ordered her to cease any proceedings regarding the record. The trial court said it would appoint a certified reporter, agreeable to both the State and the appellant, to review Halsey's record and determine whether it could be made to conform to what occurred at trial.

On November 19, 1998, the trial court appointed Susan Simmons, a certified court reporter for the United States District Court in Tyler, to perform a review of the guilt and punishment phases of the record, as well as the pretrial hearings.[6] The parties and the experts all agreed that Simmons was qualified and competent to perform the review. During the hearing, the appellant's counsel explained that he was not sure if it was legally permissible or even possible to certify the record. He reserved the right to offer evidence on this point at a later time. Halsey appeared with her attorney that day. To comply with a subpoena duces tecum requesting all materials regarding the appellant's trial, her attorney turned over the notes and disks for the entire trial. Halsey refused to testify, however, and asserted her Fifth Amendment privilege.

On December 9, 1998, Halsey's attorney produced twelve more tapes, which he claimed were additional tapes from the trial. Halsey was then relieved of her duties as the official court reporter in this case. The trial court ordered Halsey to continue to look for more tapes.

On April 1, 1999, the trial court conducted a hearing during which Simmons testified that she had revised the Halsey record of the guilt and punishment phases of the appellant's trial. Simmons submitted the revised record ("Simmons record") and her red-lined copy of the Halsey record that reflected all of the changes that she had made. Counsel for the appellant and the State were not permitted to question Simmons directly.[7] Before the hearing, the trial court provided to the parties the questions it would ask Simmons. The parties were permitted to submit written questions to the trial court, and the trial court read the questions that it concluded were relevant and not repetitive. The trial court instructed the parties not to object to questions during the testimony; they were directed to submit those objections before the next hearing. The trial court stated that it would also afford the parties an opportunity to submit a bill of exceptions. The parties were given a break during the testimony to submit further questions based on the testimony that had already been heard.

Simmons testified about the standard procedures for preparing a record of proceedings. First, during the proceedings, the certified court reporter writes on a machine notes of what occurs. The notes include a list of the people who are present, the date of the proceedings, the name of the proceedings, the testimony taken, and the list of exhibits. The machine simultaneously prints the symbols onto the notes and records the symbols onto a disk or hard drive. The symbols on the notes cannot be read or deciphered by someone without some training as a court reporter or scopist. The notes are labeled with the date and subject matter. It is common for

6. The materials for the guilt and punishment phases were given to Simmons on November 20, 1998. Francine Eikner was appointed to assist Simmons as a scopist on December 10, 1998.

7. The appellant's counsel had filed a motion to ask questions directly of Simmons, which was denied.

the court reporter to use an audiotape recorder as a backup. Generally, the recorder is connected to the microphones on the witness stand, the attorneys' tables, and the judge's bench.

Simmons testified that after the proceedings are over, the court reporter takes the disk to a computer and uses software, to which the reporter's personal dictionary has been added. The dictionary in the software produces an English translation of the symbols. The computer produces a split screen on the monitor, which shows the symbols on one side and the English translation on the other side. The English translation will show some "untranslates," which are symbols that the software does not recognize. After the reporter enters the correct word, the symbol for the word and its translation are added to the reporter's personal dictionary.

According to Simmons's testimony, if the reporter uses a scopist, and most do, the translation is put on a duplicate disk, which is given to a scopist along with the backup tapes. The scopist performs the first edit. Ordinarily, the scopist loads the disk and listens to the tapes going line-by-line checking for corrections and unrecognized words. Then this edited version is saved on another disk to leave intact the original English translation that was produced at trial,[8] and all the materials are returned to the reporter.

Simmons indicated that the reporter, after receiving the materials from the scopist, proofreads either the hard copy of the new translation or the on-screen copy while listening to the tapes. Then the reporter proofreads the record one more time, checks for spelling errors, and prints and certifies the record.

Simmons testified about her work in the appellant's case. She explained that she followed the instructions in the trial court's order. The trial court had not ordered Simmons to certify the record; she was ordered to review the record from the guilt and punishment phases of the trial and to certify it if possible. She possessed the Halsey record, the disks, tapes, notes, and some handwritten notations by Halsey. She followed the procedure that is ordinarily employed when a court reporter is unable to produce the record because of either death or disability.

Simmons testified that she first went through the notes and the tapes to be sure that she had them for each volume of the Halsey record she had been assigned. She said that it appeared that she had been provided with a complete set of materials for the guilt and punishment phases of the trial. She said it was possible to create a certifiable record based on the materials provided. The notes prepared on the machine appeared to be complete with no gaps in the proceedings and within the range of competent reporting. The disks were in useable form and appeared to be complete. The tapes were audible and seemed to be complete with no discernible gaps or alterations.

Simmons testified that she started the review process by listening to the tapes while going through the Halsey record line-by-line. She marked the corrections onto her copy of the Halsey record. When she had questions, she flipped to the appropriate portion of the notes. She did not perform a systematic review of the notes. She was able to identify witnesses when they stated their names at the beginning of their testimony. If a voice was not identified in this manner, she used the

---

**8.** Crowley's testimony indicated that, as Halsey's scopist, she edited on the original disks and recorded over the files created during the trial.

notes, which contained symbols identifying the speakers.

Simmons then took the marked version of the Halsey record and the disks to her scopist. The scopist copied each disk onto her hard drive. Then she made the changes marked in pen and saved the files on new disks so that there would be no alteration of the disks provided by Halsey. The scopist printed a hard copy of the changes. Simmons proofread the hard-copy by doing a page-by-page comparison of the changes.

This procedure was followed until all of the volumes for the guilt and punishment phases were completed. Then Simmons prepared a master index, exhibit index, and witness index, which was compared to the scopist's list. Three hard copies of the final edited version ("Simmons record") were produced along with disks with a universal translation.[9]

Simmons testified that she believed that Halsey used more than one scopist to create the record. It is standard practice for the reporter who actually heard the trial to review the changes a scopist makes using the tapes. It is normal for the final record to be different in some respects from the unedited notes. The purpose of editing the notes is to make them reflect, as nearly as possible, what happened at trial. Simmons said that the Halsey record was inaccurate and poorly prepared. She opined that the deficiencies in the Halsey record were based on a lack of proper editing. Simmons did not attend any of the proceedings in Kerrville and had no personal knowledge of what happened at trial. But Simmons testified that she believed, based on the materials provided and her expertise, she was able to render a complete and accurate record that conforms to what occurred at trial. She said

that, if the materials did not contain a complete and accurate account of the proceedings, then the Simmons record could suffer from the same flaws. But she believed that the materials provided accurate information for preparing the record. Simmons has reconstructed trial records in other cases, and she was able to certify records in those cases. In her expert opinion, the record as prepared by her had been made to conform to what happened at trial to ninety-five percent accuracy.

On April 26, 1999, the Court of Criminal Appeals ordered the trial court to ensure that the entire record, including voir dire and pretrial proceedings, conformed to what happened at trial. We ordered the trial court to independently review other parts of the record in the same manner as it had the guilt and punishment phases. On May 4, 1999, the trial court appointed Simmons and her scopist to prepare the remaining portions of the record.

On October 14, 1999, a hearing was held to receive the remaining portions of the record that Simmons had completed. She testified that the tapes were audible and seemed to have no gaps or alterations, the disks for the volumes—other than Volume 16—were useable, and the notes—although there were mistakes—could be used to the extent she needed them. She testified that, once again, she was able to certify that the record conformed to what occurred at trial. She testified that she used the same procedures used to complete the guilt and punishment phases of the record, with one exception. For Volume 16, there was no disk. Therefore, Simmons proofread the hard copy of the Halsey record with the tapes and had her scopist retype the entire volume.

Later, the parties and the trial court became aware that Volumes 10 and 11 had

9. This is known as an ASCII format, which can be read by any word processing software.

not been sent to Simmons for preparation. The materials were then sent to Simmons, and she was ordered to review the materials in the same manner as she had reviewed the other portions of the trial. The trial court ordered Simmons to revise and certify a record if possible.[10]

At a hearing on January 28, 2000, Simmons testified that she followed the same procedure for preparing and certifying the record, except for the first 54 pages of Volume 10.[11] These pages contained the proceedings for October 21, 1996. For those 54 pages, Simmons had the Halsey record, the notes, and the disk, but no tape. Going line-by-line, she compared the Halsey record with the notes taken on the day the proceedings occurred. She noted that there did not appear to be any gaps in the notes and that they were in good and useable form. Simmons refused to certify these pages, however. She explained that, based on the portions of the record she had prepared already and the state of the Halsey record, she was not comfortable certifying the first 54 pages without a tape to compare to the Halsey record. She said that her record for the first 54 pages of Volume 10 is an accurate transcription of Halsey's notes. Her decision not to certify was based on the following facts: she was not present at trial; she had no tape to use as a backup; and her review of the rest of the record indicated that she needed a tape to correct the record because it had been edited so poorly.

Simmons testified that on the tape for the afternoon session of court on October 21, 1996, in a conversation between Halsey and someone from the Sheriff's Department, Halsey mentioned that she needed some batteries.[12] Simmons believed that this might explain the absence of a tape for the morning session. Simmons believed, however, that a tape existed for the morning session because there were words that appeared in the Halsey record that did not appear in the notes. At the conclusion of the hearing, the trial court announced that it would give the parties 120 days in which to review the entire record and make objections.

On February 9, 2000, the trial court issued an order stating that Volumes 10 and 11 of the Simmons record should replace the same volumes of the Halsey record because the Halsey record did not conform to what occurred at trial. The Court, by agreement of the parties, gave the parties until March 6, 2000, to file objections to the Simmons record.

On March 2, 2000, the appellant filed written objections to the Simmons record and a written request for a hearing to resolve factual disputes about the record. The State's response to the appellant's written objections was filed April 28, 2000. On September 1, 2000, the trial court scheduled a hearing on the appellant's objections to the record to take place on September 8, 2000. The appellant's attorney subpoenaed several witnesses, including Judy Miller, Mary Docklar, Jerry Cal-

10. The appellant objected on the basis that the tapes were not authenticated. She did not agree that the trial court's action regarding the tapes was legally appropriate. The trial court overruled the appellant's objection, but said that it might revisit the issue at another time.

11. Halsey's record had been 53 pages. Simmons transcribed the reading of the indict-

ment, which was included only by reference in Halsey's record. Simmons also included some colloquy found in the notes before and after the reading of the indictment.

12. The tape for the afternoon proceedings was transcribed in the second part of Volume 10. This conversation does not appear in the record because the court was not in session.

loway, Doug Mulder, Jeff Crilley, Lindsey Roberts, Toby Shook, and Greg Davis.

On September 7, 2000, the trial court issued findings on the record and an order cancelling the hearing scheduled for the next day. The findings say that the trial court reviewed the orders issued by the Court of Criminal Appeals, the record from all hearings held to comply with the orders issued by the Court of Criminal Appeals, the findings and orders of the trial court, the appellant's objections to the record, and the State's response. The trial court found that the appellant's objections were clear and concise and would apprise the Court of Criminal Appeals of the appellant's concerns about the record. It found that the appellant's motions to suppress evidence in the proceedings on the record were beyond the scope of the orders of the Court of Criminal Appeals. It also found that an evidentiary hearing as requested by the appellant was not necessary to comply with the orders of the Court of Criminal Appeals, the orders had been complied with, and that it would not hold any other hearings unless the Court of Criminal Appeals so ordered.

In response to the trial court's order cancelling the hearing, the appellant filed her Formal Bill of Exception No. 1 and a Motion for a Hearing to Make an Offer of Proof on September 25, 2000.

The trial court responded with a finding that it no longer had jurisdiction of the case. The court forwarded the appellant's pleadings to the Court of Criminal Appeals without taking action.

## A. Third Point of Error: The Entire Record is Inaccurate and Unreliable

In her third point of error,[13] the appellant claims that she is entitled to a new trial because the reporter's record does not conform to the requirements of Texas Rule of Appellate Procedure 34.6(a)(1)[14] and because the defect cannot be corrected. Specifically she states that Rule 34.6(a)(1) requires that the reporter's record be a certified verbatim transcription of the stenographic notes of the court reporter who attended the trial. Because the Simmons record is a transcription of unauthenticated tapes prepared by a court reporter who did not attend the trial, the appellant argues, the record does not comply with the Rule. Also, the appellant argues, Halsey's notes cannot be transcribed accurately because the trial court found that the notes do not conform to what occurred at trial.[15] She also claims that settling disputes about the record with extrinsic evidence would be impossible because the trial judge who presided over the trial is retired[16] and the court reporter who created the notes has lost her certification. In essence, the appellant claims the Simmons record is a new record that

---

13. In this point of error, the appellant addresses the record generally. As noted above, there are additional issues with the first 54 pages of Volume 10 of the record. The appellant's arguments regarding those pages will be addressed separately.

14. Rule of Appellate Procedure 34.6(a)(1) states that "[i]f the proceedings were stenographically recorded, the reporter's record consists of the court reporter's transcription of so much of the proceedings, and any of the exhibits that the parties to the appeal designate."

15. This is incorrect. The trial court found that the Halsey record did not conform to what happened at trial. No specific findings were made about the notes, but Simmons testified that they appeared to be complete, useable, and within the range of competent reporting.

16. After retiring, Judge Mark Tolle began sitting as a visiting judge.

consists of a transcription of the tapes. Further, she argues that the transcription of the tapes was not done in accordance with Rule 34.6(a)(2),[17] and to permit the Simmons record to be used would blur the distinction between the two methods of producing the reporter's record.

We disagree with the appellant's characterization of the Simmons record. The revised record is not a new record created from the tapes. The Simmons record is a corrected transcription of the notes taken at trial by Halsey. Simmons testified that the defects with the Halsey record were a result of poor editing and that Halsey's notes were within the range of competent court reporting. Simmons used the tapes to correct the Halsey record that was a poorly-edited transcription of the notes taken at trial.

The appellant asserts that Simmons should not have used the tapes to correct the record. For this proposition, the appellant cites *Valenzuela v. State*, 940 S.W.2d 664, 666 (Tex.App.-El Paso 1996, no pet.), and *Ex parte Occhipenti*, 796 S.W.2d 805, 807 (Tex.App.-Houston [1st Dist.] 1990, no pet.). These cases are distinguishable.

In *Valenzuela*, the defendant's attorney requested that the official court reporter provide him with certified tapes of the proceedings so that preparation of the record would be less expensive. The El Paso Court of Appeals supported its decision to deny Valenzuela's request with many reasons. Chief among them was the fact that the "Rules of Appellate Procedure provide for preparation of the record on appeal by the clerk of the trial court and the court reporter who transcribed the proceeding and do not contemplate preparation of the

appellate record by a party or his counsel." *Valenzuela*, 940 S.W.2d at 666. The Court of Appeals also noted that the reporter's record in a criminal case may consist of a transcription of the tapes only when authorized by the Court of Criminal Appeals. *Ibid*. Because the use of tapes as the reporter's record was not authorized in Brewster County, the court reporter was not authorized to certify the tapes as the official reporter's record. *Ibid*. *Valenzuela* is distinguishable from the appellant's case because the tapes in the appellant's case were used to edit the record that was created from Halsey's notes from trial.

In *Ex parte Occhipenti*, a civil case, tapes were made, but no notes were made of the trial court proceedings. The Court of Appeals held that it could not consider the tapes because the Texas Supreme Court had not authorized Harris County district courts to use tape recordings as the certified record. *Occhipenti*, 796 S.W.2d at 807. Once again, the record in the appellant's case is a transcription of Halsey's notes that was edited with the assistance of the tapes. The appellant's case is distinguishable from *Occhipenti* on that basis.

The appellant also asserts that *Bond v. State*, 694 S.W.2d 622, 623 (Tex App.-Beaumont 1985, pet. ref'd), supports her claim that the record in this case cannot be used to decide her appeal. In *Bond*, the Court of Appeals reversed the conviction because the court reporter could not take notes during part of the State's closing argument because the prosecutor was speaking too quickly for the reporter's ability. It was later found that the tape was faulty and did not record the argument. *Ibid*. The question in the case was

---

**17.** "If the proceedings were electronically recorded, the reporter's record consists of certified copies of all tapes or other audio-storage devices on which the proceedings were recorded, any of the exhibits that the parties to the appeal designate, and certified copies of the logs prepared by the court recorder under Rule 13.2." Tex.R.App. P. 34.6(a)(2).

whether the defendant had failed to exercise due diligence in failing to object to the missing portion of the record when it was discovered. The Court held that the defendant need be diligent only in requesting the transcription of the record and that when, through no fault of his own, the defendant is deprived of the record, an appellate court cannot affirm the conviction. *Ibid.* The appellant's case is distinguishable because she has not shown that she has been deprived of the record.[18]

The appellant also directs us to *State Farm Fire & Cas. Ins. Co. v. Vandiver*, 941 S.W.2d 343 (Tex.App.-Waco 1997, no pet.). In that case, the court reporter failed to take notes of portions of depositions that were read into the record. The Court of Appeals held that the tapes could be used to establish the pages and lines of the depositions and that the record could be supplemented with the parts of the depositions. *Id.* at 343. The Court of Appeals specifically rejected its prior holding that the use of materials other than the notes taken at trial to supplement the reporter's record would constitute a new record. *Id.* at 349 (overruling *Home Ins. Co. v. Hambric*, 906 S.W.2d 956 (Tex.App.-Waco 1995, no pet.)). The appellant argues that her case is distinguishable from *Vandiver* because the procedure in that case was dependent on the existence of "a proper written transcription of the testimony made at the time the deposition was given." *Ibid.*

The State argues that *Vandiver* stands for the proposition that courts can use materials other than the official notes taken during proceedings to obtain an accurate reporter's record. The Court of Appeals said that:

While it cannot be denied that a contemporaneous verbatim recording of the events at trial is a large part of ensuring that a complete and accurate record of the trial court proceedings is prepared, the conclusion does not follow that the record will necessarily be incomplete in every instance where there is some absence of a contemporaneous verbatim recording.

*Ibid.* In *Vandiver*, portions of several exhibits and depositions were read to the jury. An audio recording of every instance where this occurred was made by the court reporter. There was no contention that what was read at trial differed in any way from the actual wording of the relevant exhibits and depositions. In addition, it was undisputed that the court reporter, by listening to the audio tapes to find where the portions of these exhibits and depositions began and ended, could reconstruct the very testimony that was missing from the original statement of facts. Therefore, the Court concluded that the statement of facts could be properly supplemented with the exhibit and deposition testimony that was missing from the original statement of facts. *Ibid.*

■ We agree with the State's reading of *Vandiver* and we adopt the reasoning of *Vandiver*. In this case, Simmons corrected the Halsey record with tapes that allowed her to reconstruct the testimony despite the inaccurate editing performed by Halsey and her scopists.

Simmons and Mullins testified that it is a common practice for court reporters to use tape back-ups in the preparation of any record to correct the notes taken at trial and to make the record as accurate as possible. The situation in the appellant's case is similar to when a court reporter is

---

18. There was no tape for the proceedings from the morning session on October 21, 1996. The record from that proceeding is found in the first 54 pages of Volume 10. We address that portion of the record in the appellant's second point of error.

unable to certify a record due to death or disability. Halsey lost her certification and was unable to correct and certify the record herself. The procedure Simmons used is the same as that used when a court reporter is disabled or dies before the record can be transcribed and certified. Simmons testified that she had used the same procedure in the past.

The appellant claims that the procedure is flawed because Simmons did not transcribe the notes. The machine used to record the notes translates the symbols to English. Simmons testified that the problem with the Halsey record was that it had been edited improperly. Transcribing Halsey's notes would not have changed the process of correcting the record with the use of the tapes. Therefore, it was not necessary.

In *Williams v. State,* 427 S.W.2d 868 (Tex.Crim.App.1967), we approved of a similar procedure in a case when the court reporter died before preparing and certifying the record. *Id.* at 870, 872. We said:

> We fail to see what more the able trial judge in the case at bar could have done under the circumstances. An appellant is not entitled to reversal merely because of the death of the court reporter. Here the trial judge availed the appellant and his counsel of three different opportunities to demonstrate why the statement of facts as finally prepared and approved were not a full, accurate and complete transcription of the court reporter's notes taken at the trial. He certainly had his day in Court upon the settlement of the record. In absence of a showing made that the record before us is not what occurred at the trial and that the appellant's rights were preju-

diced, we overrule appellant's first ground of error.

*Id.* at 872. The death or disability of a court reporter, without more, does not entitle the appellant to a new trial. Likewise, that a court reporter has lost her certification, without more, does not entitle the appellant to a new trial.

The appellant admits that the use of another court reporter and backup tapes is a common practice when a court reporter is unable to complete and certify the record, but she says that Simmons used the tapes to make more than 30,000 substantive changes to the record without systematically reviewing the notes. The appellant fails to point to any specific corrections made by Simmons that show that the Simmons record is incomplete or inaccurate. The appellant argues that, if the court reporter can use tapes to make so many substantive changes to the record without a hearing, she should be required to follow the rules to protect the integrity of the tapes. *See* Tex.R.App. P. 13.2(e).[19]

There is no threshold number of changes that triggers Rule 13.2(e). And, no matter the number of corrections made, the appellant has not even attempted to show that the record is incomplete or inaccurate. Simmons used all the materials provided her to revise the record.

The appellant also directs us to *Soto v. State,* 671 S.W.2d 43, 44–46 (Tex.Crim. App.1984). In that case, we held that a record created from tapes of proceedings was unacceptable. The defendant had requested that a court reporter record proceedings in his case. The trial court denied the defendant's request because no court reporter was available. The county clerk made tape recordings of the proceedings instead. The deputy county clerk

---

**19.** Rule 13.2(e) requires that the official court reporter "ensure that no one gains access to the original recording without the court's written order."

transcribed the tapes. Parts of the tapes were inaudible, and therefore the record contained gaps.

We granted review to determine whether former Texas Code of Criminal Procedure Article 40.09 "mandated that a certified court reporter take down and transcribe the testimony at trial or whether the trial court may employ other comparable alternative methods of insuring an appellate record is prepared, after the appellant requested that a court reporter take down the proceedings." *Id.* at 44. We held that deviating from the procedure set out in former Article 40.09 in this way was not permitted. We have said that the reasoning of *Soto* is sound today although it was an application of Article 40.09 rather than Rule of Appellate Procedure 34.6(a)(1), 34.6(e)(2), and the Appendix, Order Directing Form of Appellate Record (b)(1)(q). *See Gomez v. State*, 962 S.W.2d 572, 574 (Tex.Crim. App.1998). The requirements of the former article were incorporated in the Rules of Appellate Procedure. *Ibid.*

We conclude that the appellant's case is more like *Williams* than *Soto*. The tapes in this case were used to correct and edit the Halsey record; Simmons did not create a new record. In this case, Halsey made notes of the trial that Simmons testified were within the range of competent reporting. Simmons testified that the editing process caused the inaccuracies in the Halsey record. Simmons used the tapes and the notes from the trial to correct the Halsey record and make it conform to what occurred at trial.

### (1) Tapes

█ The appellant also complains of the authenticity and accuracy of the tapes used by Simmons to correct the record. The unauthenticated and possibly inaccurate tapes, she argues, should not have been used to correct and certify the record.

The testimony during hearings on the reporter's record supports a finding that the tapes were authentic. Simmons testified that the tapes contained recordings of proceedings at trial that corresponded with the notes and Halsey's record. An assistant district attorney testified that Halsey gave him the tapes. She represented those tapes as being from the appellant's trial. Although Halsey may have lied to cover up the existence of the tapes, other independent evidence indicates that the tapes were authentic. Crowley testified that the tapes looked like the ones she used to edit the record.

The greater concern is whether the tapes are complete and accurate. The testimony given during the post-trial proceedings indicates that the trial court could have concluded that the tapes were complete and accurate. The trial judge who presided over the post-trial proceedings about the record listened to the tapes. He implicitly found that the tapes were complete and accurate because he allowed Simmons to use them to review and certify the record. Simmons testified that the tapes sounded complete, they flowed logically, and there were no audible alterations. Simmons explained that she is not an expert regarding audio recordings and that she had not been present for the proceedings in the trial. As a certified court reporter, however, she had prepared many transcripts using tapes to make corrections. Simmons had extensive experience listening to tapes of court proceedings. She testified that in the past she had prepared and certified records of other proceedings with the use of backup tapes where she had not been present for the proceedings. The appellant has failed to present any evidence that the tapes were not complete and accurate. She did

not submit expert testimony about the ease with which a tape may be altered, and she did not request an expert to test the tapes for alteration.

The appellant claims that she was not given an opportunity to compare the Simmons record to Halsey's notes. We do not address whether the trial court would have abused its discretion to deny such a request. The appellant never requested an opportunity to compare the Simmons record to the notes.

The appellant concedes that the trial court's findings are entitled to deference, but she alleges that the trial judge who presided over the post-trial proceedings did not listen to the tapes and is erroneously relying on the opinion of Simmons who is not an expert and was not present for the proceedings and had no personal knowledge thereof. Judge Robert Francis did not rely solely on the opinion of Simmons. He stated on the record that he listened to the tapes himself. Simmons was recommended by the three court reporters who reviewed the Halsey record initially. She had years of experience preparing and certifying records. And the appellant agreed to have Simmons review the record and certify it if possible. If the appellant did not trust Simmons's opinion about the accuracy and completeness of the tapes, she could have requested an expert to examine the tapes. Without more, we cannot say that the trial court erred in permitting Simmons to use the tapes to correct the record.

### (2) Parentheticals

The appellant also complains about the accuracy of the parentheticals that Simmons adopted from the Halsey record, which the trial court declared did not conform to what occurred at trial. As explained above, Simmons testified that Halsey's notes were within the range of competent reporting. The parentheticals came from that record. The trial court declared that the Halsey record did not conform to what occurred at trial and Simmons testified that the problem with the record was the editing that took place after the notes were taken. The trial court could have found that the parentheticals taken down at trial were accurate because they would not have been changed during Halsey's editing process. Simmons changed some of the parentheticals, but there is no indication and the appellant does not argue that any of these changes were material. For example, one change was to add "no response" to the parenthetical when initially it had been in the verbal text. Simmons also added the parenthetical "shakes no" when the verbal answer was, "NUm-hum," [*sic*] and she added "nod affirmatively" when the verbal answer was "Uh-hum." In another instance, the verbal answer was "Uh-huh," and Simmons changed the parenthetical from nod affirmatively to shake no. "Uh-huh" was used in other places in the record to show a negative response. Of approximately 500 parentheticals found in the voir dire portion record in a table provided by the appellant, only fifteen were changed by Simmons and none were material. *See* Tex.R.App. P. 34.6(f).

### (3) Correcting the Record

The appellant argues that the Simmons record cannot be a corrected record because the official record can be corrected only if a party alleged that a specific part of the record was inaccurate and the trial court held a hearing. She claims that no hearing was held in accordance with the Rules. The appellant is referring to Rule 34.6(e), which provides for correcting the

record.[20] The Halsey record was filed with this Court before the appellant discovered any inaccuracies. When the appellant brought the specific inaccuracies to our attention, we submitted the dispute to the trial court and ordered it to ensure that the record conformed to what occurred at trial. The trial court conducted hearings, found that the Halsey record did not conform to what occurred at trial, and appointed Simmons to correct the record, if possible. Simmons was able to correct and certify that the record, with the exception of the first 54 pages of Volume 10, conformed to what occurred at trial.

The appellant cites *Little v. State,* 131 Tex.Crim. 164, 97 S.W.2d 479 (1936), for the proposition that when a court reporter died before transcription of the notes, disputes regarding the record could not be resolved in a death penalty case. The Court failed to mention whether the proceedings were recorded, but it is unlikely that in 1936 tape recorders were widely available for the use of recording court proceedings.[21] Today we have use of reliable recording devices to back up the court reporter's notes. And we have since recognized their efficacy. *See Williams,* 427 S.W.2d at 868.

■ The appellant is now complaining about the entire Simmons record. But unlike her complaints about the Halsey record, she has provided no specific examples of inaccuracies in the Simmons record. A global complaint that the entire record is inaccurate, in light of the procedures used in the profession and in the absence of any specific examples of inaccuracies, is not sufficient for us to conclude that the record is inaccurate.

To say that there were problems in obtaining the reporter's record in this case is a gross understatement. Halsey's credibility has been seriously called into question: she may have lied to the trial court about the existence of the tapes; she spoke with reporters about the problems with the record while asserting her Fifth Amendment privilege to not incriminate herself in court; she told a reporter that she hoped the appellant would not get a new trial because of the mistakes; she also told a reporter that she would not rely on the tapes because they could be altered. Other facts that tend to discount the accuracy of the record include the fact that Simmons used the same materials to create the corrected record that Halsey used to create the first record. And Halsey's record was declared to not conform to what occurred at trial. In addition, the trial judge who presided over the correction of the record had no personal knowl-

---

**20.** The complete text of Rule 34.6(e) states:

(1) Correction of Inaccuracies by Agreement. The parties may agree to correct an inaccuracy in the reporter's record, including an exhibit, without the court reporter's recertification.
(2) Correction of Inaccuracies by Trial Court. If the parties cannot agree on whether or how to correct the reporter's record so that the text accurately discloses what occurred in the trial court and the exhibits are accurate, the trial court must—after notice and hearing—settle the dispute.
After doing so, the court must order the court reporter to correct the reporter's record by conforming the text to what occurred in the trial court or by adding an accurate copy of the exhibit, and to certify and file in the appellate court a corrected reporter's record. (3) Correction After Filing in Appellate Court. If the dispute arises after the reporter's record has been filed in the appellate court, that court may submit the dispute to the trial court for resolution. The trial court must then ensure that the reporter's record is made to conform to what occurred in the trial court.

**21.** Although successfully tested as early as 1935, tape recorders were not widely available in the United States until after World War II. *See* David Morton, *The Tape Recorder, in* OFF THE RECORD: THE TECHNOLOGY AND CULTURE OF SOUND RECORDING IN AMERICA (2000).

edge of the proceedings at trial because he did not preside over the appellant's trial.

But according to Simmons, the main flaw with the Halsey record was the editing process. Although she testified that Halsey's notes contained mistakes, she also testified that the notes were within the range of competent reporting. It was the process of editing the notes, not the materials used to edit the notes, that caused there to be so many mistakes in the Halsey record. Simmons was found to be an experienced certified court reporter. Both parties agreed to have her appointed, and she was recommended by the three experts who initially reviewed the Halsey record. She testified that she was able to certify the record with the use of the tapes. And the appellant did not produce any evidence that Simmons's method was not accepted by other certified court reporters. We overrule the appellant's third point of error.

## B. Second Point of Error: A Significant Portion of the Record Has Been Lost or Destroyed

█ In her second point of error, the appellant claims that her conviction must be reversed because a significant portion of the record necessary to her appeal has been lost or destroyed through no fault of her own. Here, the appellant is complaining about the first 54 pages of volume 10 of the Simmons record, which consisted of a transcription of the proceedings from the morning of October 21, 1996. This is the portion of the record Simmons would not certify as a true and accurate transcription of what occurred in the proceedings. Instead, she certified that it is a true and accurate transcription of Halsey's notes of the proceedings. Because the record cannot be certified either as a verbatim transcription of the notes taken at trial or as a transcription of tapes in accordance with

Rule 34.6(a)(2), and because the uncertified portion of the record is necessary to the resolution of her complaint about trial counsel's conflict, the appellant asserts she is entitled to a new trial under Rule 34.6(f).

Texas Rule of Appellate Procedure 34.6(f) provides that an appellant is entitled to a new trial if a significant and necessary part of the reporter's record is lost or destroyed through no fault of her own, the appellant timely requested the record, and the parties cannot agree to the record.

Rule 34.6(f) is a relatively new rule, but the principles that brought it into being are not. It has a predecessor in the former Rules of Appellate Procedure and more than one predecessor within former versions of the Code of Criminal Procedure. We have noted before that the cases under former versions, including Article 40.09 of the Code of Criminal Procedure, are still helpful and that the principles underlying these former versions apply to the newer rules. *See Gomez v. State*, 962 S.W.2d 572, 574 (Tex.Crim.App. 1998); *Gibbs v. State*, 819 S.W.2d 821, 828 (Tex.Crim.App.1991).

The Rule applies whether we are faced with the loss or destruction of the entire record or only a portion of the record. *See, e.g., Harris v. State*, 790 S.W.2d 568, 574 (Tex.Crim.App.1989) (pretrial motion); *Austell v. State*, 638 S.W.2d 888, 890 (Tex. Crim.App.1982) (voir dire examination); *Gamble v. State*, 590 S.W.2d 507, 509 (Tex. Crim.App.1979) (final arguments); *Hart-graves v. State*, 374 S.W.2d 888, 890 (Tex. Crim.App.1964) (hearing on motion for new trial). We have said that "the circumstances in such cases should be viewed from the appellant's standpoint, and any reasonable doubt resolved in favor of the appellant." *Gamble*, 590 S.W.2d at 508 (citing *Young v. State*, 146 Tex.Crim. 220, 222, 172 S.W.2d 500, 501 (1943); *Lamkin*

*v. State,* 138 Tex.Crim. 311, 317, 136 S.W.2d 225, 228 (1940)). Further, the unavailability of the record through no fault of the appellant is not immune from a harm analysis. The provision in the rule that the appellant show that the missing portion of the record is necessary to her appeal is itself a harm analysis. *Issac v. State,* 989 S.W.2d 754, 757 (Tex.Crim.App. 1999).

■ So, the appellant must show (1) that a significant portion of the record was lost or destroyed, (2) through no fault of her own, (3) that the missing portion of the record is necessary to her appeal, and (4) the parties cannot agree on the record. The third requirement is dispositive of this point of error.[22]

The appellant asserts that the part of the record at issue in this point of error is essential and necessary to her appeal on two bases. First, she alleges that the first 54 pages of Volume 10 are essential to resolve her first point of error regarding a potential conflict of interest. Second, the appellant alleges that the missing portion of the record is necessary to her appeal because prospective jurors received preliminary instructions that may have been erroneous.

The appellant includes no point of error regarding the instructions given to prospective jurors. The suggestion that instructions *may* have been erroneous, without more, does not make that portion of the record necessary to her appeal. Also, as the State notes, the instructions given to prospective jurors during the morning session were virtually identical to the instructions given during the afternoon session. And Simmons testified that the afternoon session that she heard on tape was very similar to the notes from the morning session. The appellant has not shown that the portion of the uncertified record dealing with prospective jurors is necessary to her appeal.

Next, we will address whether the missing pages dealing with the substitution of counsel and potential conflict are necessary to the appeal. In her first point of error the appellant claims that her Sixth Amendment right to effective assistance of counsel was violated because her lead counsel, Doug Mulder, had an actual conflict of interest and the trial court failed to conduct a hearing on the State's motion to determine whether Mulder should be disqualified.

A close look at this point of error indicates that the appellant is not complaining about the trial court's actions on October 21, 1996. The State filed its motion on November 12, 1996, and any potential error in the trial court's failure to hold a hearing on that motion can be reviewed without reference to the uncertified portion of the record. Her complaint that the trial court did not hold a hearing on the State's motion regarding a potential conflict arises after the proceedings that are contained within the first 54 pages of Volume 10 were held. The appellant concedes as much when she says in her brief:

> Furthermore, a knowing and intelligent waiver of the conflict on October 21 would not have waived Appellant's right to object to [the conflict] on November 12, when the State disclosed new circumstantial evidence of Darin's involvement in the capital murder, unless she prospectively waived her right to raise the issue again if new evidence emerged.

22. Because the third requirement is dispositive, we decline to address the other requirements of Rule 34.6(f).

Because her complaint on appeal is about the trial court's failure to hold a hearing after the State filed its motion about a potential conflict, the appellant fails to satisfy the requirement of Rule 34.6(f) because she has failed to show that the missing portion of the record is necessary to her appeal. We overrule the appellant's second point of error.

### C. Fourth and Fifth Points of Error: Failure to Hold a Hearing on Objections to the Simmons Record

■ In the appellant's fourth and fifth points of error, she complains that the proceedings the trial court conducted about the appellant's objections to the Simmons record did not comply with the requirements of federal due process or Texas Rule of Appellate Procedure 34.6(e)(2). As a result, she claims, she is entitled to a hearing before the Simmons record can be used to decide her appeal. The appellant cites *Chessman v. Teets,* 354 U.S. 156, 77 S.Ct. 1127, 1 L.Ed.2d 1253 (1957). This case does not support the appellant's claim.

In *Chessman,* the court reporter who made notes during the trial died before he was able to transcribe them. A second court reporter, who was related to the prosecutor by marriage, took the notes and produced a record from them in part by discussing the testimony with the prosecutor and the police officers who testified at trial. Chessman was not represented in person or by counsel in the proceedings to approve the new record. The United States Supreme Court held that this procedure did not comport with due process.

All we hold is that, consistently with procedural due process, California's affirmance of petitioner's conviction upon a seriously disputed record, whose accu-

racy petitioner has had no voice in determining, cannot be allowed to stand. *Id.* at 164, 77 S.Ct. 1127.

The appellant also claims that *Lankford v. Idaho,* 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991), supports her claim. In that case, Lankford and his older brother were convicted of murder. Lankford was formally informed of a possible death sentence at his arraignment, but later discussions with the prosecutors, various presentencing orders, and other factors led him to believe the death penalty would not be sought or imposed. After the sentencing hearing, the trial judge imposed the death penalty with no prior warning that he was considering it. *Id.* at 112–16, 111 S.Ct. 1723.

The Supreme Court held that Lankford received insufficient notice that the trial court might impose the death penalty, which violated due process. *Id.* at 126, 111 S.Ct. 1723. The Court explained that if Lankford had known of the possible sentence, he would have conducted his hearing differently and perhaps had a different sentenced imposed. *Ibid.* Notice of the issues to be resolved are necessary to due process. *Ibid.*

The appellant's case is distinguishable from *Chessman* and *Lankford* because the appellant and her counsel had notice of the proceedings, were present during the extensive proceedings on the certification of the Simmons record, and were given ample opportunity to make objections to the Simmons record. The proceedings conducted by the trial court to make the record conform to what happened at trial complied with federal due process. We overrule the appellant's fourth point of error.

The appellant also claims that she is entitled to a Rule 34.6(e)(2) hearing to settle disputes about the record before it can be used to decide her appeal. The appellant asserts that the Rule requires

the trial court to settle disputes about the record after notice and a hearing. Further, the appellant says that, in hearings required by the Texas Code of Criminal Procedure, the defendant must be allowed to present live testimony and cross-examine the State's witnesses unless a hearing based on documents is allowed. *See Garcia v. State,* 15 S.W.3d 533, 536 (Tex.Crim. App.2000). She sees no reason this rule should not apply in a Rule 34.6(e)(2) hearing.

But Rule 34.6(e)(2) and its requirements apply when inaccuracies are discovered *before* a reporter's record is filed in the appellate court. In this case, the inaccuracies were discovered *after* the record was filed in this Court. The Halsey record was filed April 24, 1998. The appellant filed a motion in this Court to correct or clarify the record on October 13, 1998.

Rule 34.6(e)(3) applies when inaccuracies are discovered after a record has been filed in the appellate court. It states that: "If the dispute arises after the reporter's record has been filed in the appellate court, that court may submit the dispute to the trial court for resolution. The trial court must then ensure that the reporter's record is made to conform to what occurred in the trial court." There is no requirement that a hearing be held to correct the record after the record has been filed in the appellate court. And, as we explained above, the Simmons record is not a new record; it is the correctly-edited transcription of Halsey's notes.

Even if we were to assume that the Simmons record was a new record that had not been filed in this Court prior to discovery of the inaccuracies, the appellant had three opportunities to put on witnesses and ask questions about the Simmons record. Although her counsel was not permitted to ask questions of Simmons directly, counsel for both the appellant and

the State were permitted to submit questions to Judge Francis who read them to Simmons. The appellant was given an opportunity to submit more questions after a break in the proceedings and again several days after the hearings. Simmons prepared the record in stages. First she prepared and submitted the record for the guilt and punishment phases. These volumes were delivered to the trial court, the appellant, and the State on April 1, 1999. And then, pursuant to this Court's order and by appointment of Judge Francis, Simmons prepared and submitted the record for voir dire and the pretrial hearings. These volumes were delivered to the trial court, the appellant, and the State on October 14, 1999. Later the parties discovered that Simmons had never received the materials to correct and certify volumes 10 and 11. Simmons was provided these materials with which she prepared and submitted corrected volumes on January 28, 2000. She followed the same procedure in preparing the entire record with the exception of the first 54 pages of volume 10, for which she had no tape, and volume 16, for which she had no edit disk but had the tape.

The appellant had over six months to review the first installment of the Simmons record and to have another expert review it for problems. When the second installment was delivered, the appellant had another opportunity to submit questions to be answered by Simmons. Then the appellant had another three months to review the portions of the record already received before the final installment of the record was received.

After all the corrected volumes had been received, the appellant submitted her written objections to the trial court, including a request for another hearing. The State responded to the request by stating that there were no factual disputes needing to

be resolved. The trial court set a hearing date but later cancelled it, finding that further proceedings were outside the scope of this Court's orders. The appellant still showed no factual disputes that required an additional hearing to be resolved.

We hold that the appellant was not entitled to a hearing under Rule 34.6(e)(2). In the alternative, we hold that the appellant had ample notice and opportunity to present live witnesses regarding her objections to the Simmons record. We overrule the appellant's fifth point of error.

## D. Fourteenth Point of Error: Failure to Rule on Bill of Exception

 In the appellant's fourteenth point of error, she complains that the trial court erred in refusing to rule on her formal bill of exception. Within this point of error, she claims that Rule of Appellate Procedure 33.2 requires the trial court to conduct a hearing unless the parties agree to the bill of exception.

The appellant filed her formal bill of exception September 25, 2000. It explains that on September 1, 2000, in the presence of the State and the appellant's counsel, the trial court announced that it would hold a hearing on the appellant's objections to the trial record. On the same day, the appellant presented a written application to subpoena an out-of-state witness. The trial court orally authorized another district judge to sign a certificate granting the request. On September 6, 2000, one or more of the State's attorneys made an ex parte request to seal the appellant's motion to suppress the tapes and Halsey's statement regarding the tapes. On September 7, 2000, the trial court filed a written order canceling the hearing scheduled for the next day without giving the appellant an opportunity to be heard on the matter.

The State makes several arguments in response. It argues that the appellant's formal bill of exception failed to (1) identify issues that could not be resolved from the existing records or (2) include evidence that the appellant wished to produce at a hearing. It also argues that pursuant to *Lewis v. State*, 711 S.W.2d 41, 43 (Tex. Crim.App.1986), and the cases cited therein, the trial court had authority to act only within the scope of the order abating the case. Because the order abating the case gave the trial court authority to make the reporter's record conform to what occurred at trial, the State argues, the trial court did not have authority to rule on the appellant's formal bill of exception. The State's final argument is that the trial court's failure to act on the appellant's bill of exception was harmless. It states that the matters in the bill are generally reflected in the record and do not support her claims on appeal.

The appellant failed to identify in the formal bill of exception claims that she could not have presented on appeal. On September 25, 2000, the appellant filed her formal bill of exception. The trial court issued an order on October 3, 2002, stating that it had no jurisdiction to consider the appellant's pleadings because the case had already been returned to this Court.

We will assume without deciding that the appellant's request to make a formal bill of exception was within the scope of this Court's orders to the trial court to make the record conform to what occurred at trial. Even so, much of the information included in the appellant's formal bill of exception was already in the record forwarded to this Court. The remaining information does not relate to the appellant's claims on appeal. And, as the State argues, the appellant has failed to point to any claims on appeal she could not make because of the trial court's failure to rule

on her formal bill of exception. Therefore, she has failed to show she was harmed. Tex.R.App. P. 44.2(b). We overrule the appellant's fourteenth point of error.

### E. Eleventh, Twelfth, and Thirteenth Points of Error: Providing Jury with an Inaccurate Transcription of the Record

In her eleventh, twelfth, and thirteenth points of error, the appellant claims that the trial court violated Code of Criminal Procedure Articles 36.27 and 33.03 and Fourteenth Amendment Due Process by providing the jury with an inaccurate transcription of Darin Routier's testimony while the appellant was not present. The State responds that the trial court did not err because (1) the appellant's attorney waived her presence at the in-chambers discussion of the jury note and the trial court's response and (2) the record reveals no harm because the inaccurate portions of the record were immaterial to the jury's questions.

During the jury's deliberations on the question of the appellant's guilt, the jury sent a note to the trial court stating, "Some of us remember hearing Darin say that he did not lock the door from the utility room to the garage before he went to bed, 6/5/96, the rest of us remember that Darin said he locked this door. Which is right?" RR 46:5358. Before a meeting in chambers with three of the appellant's attorneys and one of the prosecutors, the trial court had the court report-

er prepare an excerpt of the relevant testimony. The trial court provided copies to the attorneys and asked if they had any objections. The attorneys stated on the record that they had no objections to providing the jury with the excerpt.

Then the trial court noted that the appellant herself was not present for this meeting. The trial court asked the appellant's attorneys, Mulder and Mosty, if they waived the appellant's presence at that meeting. Mulder and Mosty each said that they waived the appellant's presence. The excerpt was sent to the jury.

#### (1) Articles 33.03 and 36.27

The appellant argues that she had a right under Article 33.03 to be present when the court responded to the jury's request.[23] She failed to object at the earliest opportunity that her rights under these Articles were violated. Thus, she has failed to preserve error. Tex.R.App. P. 33.1. Nonetheless, in an abundance of caution, we will address the merits of appellant's claim.

Article 33.03 provides criminal defendants with a statutory right to be present during their trials. It also allows criminal defendants to be absent, if they choose, after pleading to the indictment in a bench trial or after jury selection in a jury trial.

The appellant cites *Hill v. State*, 54 Tex. Crim. 646, 114 S.W. 117 (1908), in support of her claim. In that case, the Court

---

**23.** Code of Criminal Procedure Article 33.03 reads, in full:

In all prosecutions for felonies, the defendant must be personally present at the trial, and he must likewise be present in all cases of misdemeanor when the punishment or any part thereof is imprisonment in jail; provided, however, that in all cases, when the defendant voluntarily absents himself after pleading to the indictment or information, or after the jury has been selected when trial is before a

jury, the trial may proceed to its conclusion. When the record in the appellate court shows that the defendant was present at the commencement, or any portion of the trial, it shall be presumed in the absence of all evidence in the record to the contrary that he was present during the whole trial. Provided, however, that the presence of the defendant shall not be required at the hearing on the motion for new trial in any misdemeanor case.

found reversible error when a defendant voluntarily absented himself from his proceedings even though his attorney waived his right to be present. *Id.* at 650, 114 S.W. at 119. The Court applied no harm analysis because that decision predated the adoption of the Rules of Appellate Procedure.

The record does not reveal why the appellant was not present. The record shows that the appellant's attorneys waived her presence. The appellant does not allege that the waiver was erroneous, and she does not allege that she was not aware of the proceedings. She has not shown that the trial court erred in accepting her attorneys' waiver of her presence.

Article 36.27[24] provides a procedure in the event jurors have questions about the case. Before answering a jury's question, the trial court should use reasonable diligence to secure the defendant's and her counsel's presence. The appellant does not allege that the trial court failed to use reasonable diligence in obtaining her presence. The appellant's only quarrel with the trial court's procedure is that she was not present for the proceedings when the trial court read the jury's question to the attorneys for her and the State and when the trial court read its proposed response. The appellant has not explained the reason for her absence from this meeting. She still does not allege that she was unaware of the proceedings. The trial court did not err in accepting her attorneys' waiver of her presence.

## (2) Federal Due Process

 The appellant claims that the trial court also violated her constitutional right to be present at a critical stage in her trial. She claims that she had a right to be present because the proceeding had a substantial relationship to her ability to defend herself. The State argues that the appellant, through her counsel, waived her right to be present.

The appellant cites *Adanandus v. State*, 866 S.W.2d 210 (Tex.Crim.App.1993), in support of her claim. In that case, the defendant was not present for a pretrial meeting in the judge's chambers regarding a television reporter's recording of potential jurors as they entered the courtroom. In accord with the United States Supreme Court's holdings, we said that a defendant's right to be present is triggered when the proceedings bear a substantial relationship to the opportunity to defend. *Id.* at 219 (citing *Snyder v. Massachusetts*, 291 U.S. 97, 105–08, 54 S.Ct. 330, 78 L.Ed. 674 (1934)).

In this case, the appellant claims that because the testimony was not about trivial or insubstantial matters, her due process right to be present was triggered. In

---

**24.** Code of Criminal Procedure Article 36.27 reads, in full:

When the jury wishes to communicate with the court, it shall so notify the sheriff, who shall inform the court thereof. Any communication relative to the cause must be written, prepared by the foreman and shall be submitted to the court through the bailiff. The court shall answer any such communication in writing, and before giving such answer to the jury shall use reasonable diligence to secure the presence of the defendant and his counsel, and shall first submit the question and also submit his answer to the same to the defendant or his counsel or objections and exceptions, in the same manner as any other written instructions are submitted to such counsel, before the court gives such answer to the jury, but if he is unable to secure the presence of the defendant and his counsel, then he shall proceed to answer the same as he deems proper. The written instruction or answer to the communication shall be read in open court unless expressly waived by the defendant.

All such proceedings in felony cases shall be a part of the record and recorded by the court reporter.

*Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), the Supreme Court outlined the parameters of a defendant's due process right to be present at a proceeding. The Court said "whenever [the defendant's] presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge" the defendant has a right to be present. The "presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.* at 105–106, 108, 54 S.Ct. 330.

The appellant has failed to show that a fair and just hearing was thwarted by her absence, especially since her attorneys were present and waived her right to be present. In the absence of a showing that the waiver was erroneous, we cannot say that the trial court violated the appellant's federal due process right to be present for the proceeding.

### (3) Harm Analysis

■ Even if we were to assume that the trial court erred, the appellant could not prevail under either the constitutional or the nonconstitutional error standard. *See* Tex.R.App. P. 44.2(a) & (b).[25] An appellant is harmed by a constitutional error unless after reviewing the record, the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex.R.App. P. 44.2; *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Any nonconstitutional violation is reviewed under the standard

explained in *Johnson v. State,* 967 S.W.2d 410 (Tex.Crim.App.1998), in which we said "[a] criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Id.* at 417.

The appellant asserts that she was harmed because the trial court gave incorrect information to the jury in her absence. The record does not support the appellant's claim.

The jury had a dispute about Darin's testimony that he had locked the garage door and the front door, but not the utility room door on the night of the murders. The State impeached Darin with testimony from the pretrial bond hearing at which he testified that he had locked all the doors in the house. Darin explained the discrepancy by stating that he probably misunderstood the question asked at the bond hearing.

The portion of the testimony given to the jury follows. The markings show the portions altered in the Simmons record.

State: Okay. The garage door, you just testified a few minutes ago, that when you were out there with the inventory for the garage sale that the garage door was up, correct?

Darin: *Well* it was up when I was out there I had pulled it down before I went to bed.

State: All right. So, before you ever went back inside that house, you

**25.** Rule 44.2 Reversible Error in Criminal Cases.

(a) Constitutional error.

If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

(b) Other errors.

Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

closed it and you latched it, didn't you?

Darin: *I* latched it from the inside.

State: *Mat[t]er* of fact you locked the doors, you locked both the front and the back doors *to* the residence before you went to bed, didn't you?

Darin: No, sir I didn't. I locked the front door and only the garage door. I never locked the door between the garage and the utility room.

State: Sir, on September the 12th of *1996,* do you remember me asking you the question, after we had talked about the garage door: "And the other doors in the house were locked when you *when* to sleep also?" Do you remember what your answer was back then, Mr. Routier?

Darin: That they *are* all locked.

State: Would you like for me to show you your answer?

Darin: If you would, yes, sir.

State: *Okay.* I'll be happy to. *All right.* My question began on page 168 *of* line 3, your answer was at line 5 do you see your answer?

Darin: "*And* the other doors in the house, they were locked when you went to bed?"

State: Yes, sir. And your answer was: "Yes, sir." Correct?

Darin: Yes, sir. "The garage door and the front door were locked."

State: You see, that is not the question that I asked back on September the 12th, was it? I didn't say, "Did you lock the garage door and the front door, that is not the question that I *asked, is it?*"

Darin: You said all doors.

State: I said the other doors in the house, *y*ou understood what I meant back then, didn't you?

Darin: Well, I'm not really sure if I did or not.

State: Sir, that is your house, *you don't have any other doors,* you have a front door, a door to the garage and *the* garage door, don't you?

Darin: And a sliding glass door and 48 windows.

State: That's right. *As a* matter of fact, the sliding glass was also locked, wasn't it?

Darin: Yes, sir, it was. All exterior doors were locked.[26]

26. The text of the Simmons record with underlines marking differences in the text is as follows:

State: Okay. The garage door, you just testified a few minutes ago, that when you were out there with the inventory for the garage sale, *that the window*—that the garage door was up; correct?

Darin: *The garage door,* it was up when I was out there, I had pulled it down before I went to bed.

State: All right. So before you ever went back inside that house, you closed it, and you latched it, didn't you?

Darin: Latched it from the inside.

State: *Matter* of fact, you locked the doors, you locked both the front and the back doors *of* the residence before you went to bed, didn't you?

Darin: No, sir, I didn't. I locked the front door and only the garage door. I never locked the door *in* between the garage and the utility room.

State: Sir, on September the 12th of '96 do you remember me asking you the question, after we had talked about the garage door: "And the other doors in the house were locked when you *went* to sleep also?" Do you remember what your answer was back then, Mr. Routier?

Darin: That they *were* all locked.

State: *Would you like for me—*

Darin: *I would—*

State: Would you like for me to show you your answer?

Darin: If you would, yes, sir.

State: I'll be happy to. My question *begins* on page 168 *at* line 3. Your answer was at line 5. Do you see your answer?

*Sic passim.* The allegation that the jury received incorrect substantive information is unfounded. The changes Simmons made to the portion of Darin's testimony excerpted for the jury during its deliberations were immaterial and did not change the substance of the testimony. The testimony as presented in the excerpt and as presented in the Simmons record supported the appellant's theory of the case. In addition, the appellant has not raised any claim on appeal that inaccurate information was provided to the jury. Her only complaint is that she was not present when the trial court held a meeting regarding the jury's note.

The appellant also argues that she was harmed by her absence because she probably could have recognized the mistakes in the transcript of her husband's testimony about locking the doors and windows because she knew the witness and the facts. But the record fails to show, and the appellant fails to identify, any specific facts that she could have pointed out to the trial court that her attorneys could not have.

Even if we assumed that the trial court erred in allowing the appellant's attorneys to waive her right to be present, the record supports beyond a reasonable doubt the conclusion that any potential error did not contribute to the jury's verdict. We overrule the appellant's eleventh, twelfth, and thirteenth points of error.

## II. First Point of Error: Conflict of Interest in Attorney's Representation

In the appellant's first point of error, she claims that she was deprived of her Sixth Amendment right to effective assistance of trial counsel because her lead counsel, Doug Mulder, had a conflict of interest, of which the trial court was aware, and the trial court failed to have a hearing on the State's motion to determine whether Mulder should be disqualified. Specifically, the appellant claims that Mulder's representation of the appellant's husband, Darin Routier, at a show-cause hearing on the alleged violation of a gag order prevented Mulder from pursuing a trial strategy to show that Darin could have committed the murder with which the appellant was charged.

### A. Facts

On September 19, 1996, the State filed a motion to discharge the appellant's appointed attorneys because Mulder had informed the trial court on September 12, 1996, that he had been retained to represent the appellant. The trial court held a

---

Darin: "The other doors in the house they were locked when you went to bed?"
State: Yes, sir. And your answer was: "Yes, sir." Correct?
Darin: *Yes, sir.*
State: *Okay.*
Darin: The garage door and the front door were locked.
State: You see, that is not the question that I asked back on September the 12th *though,* was it? I didn't say, "Did you lock the garage door, and the front door?" That is not the question that *I asked, did I?*
Darin: You said all doors.
State: I said the other doors in the house. You understood what I meant back then, didn't you?

Darin: Well, I'm not really sure if I did or not.
State: Sir, that is your house. *You know how many doors.* You have a front door, *and* a door to the garage and *you have a* garage door, don't you?
Darin: And a sliding glass door, and 48 windows.
State: That's right. Matter of fact, the sliding glass was also locked, wasn't it?
Darin: Yes, sir, it was.
State: *Okay.*
Darin: *All exterior doors were locked.*

hearing on September 20, 1996, on the allegations that Darlie Kee, the appellant's mother, and Darin Routier, the appellant's husband, had violated a gag order imposed by the court by talking about the case on the radio. The gag order prohibited witnesses or prospective witnesses from talking about the expected testimony of the appellant or any witness, the character, reputation, or credibility of any witness, the contents of any statement given by the appellant, and the nature of evidence that might be presented.

At the beginning of the hearing, Mulder said, "I am retained by Ms. Kee to represent her and she has asked me to represent Darin as well, I didn't know that until this morning." Mulder did not introduce any evidence or call Darin as a witness. The trial court asked questions of Darin without placing him under oath. The trial court found that Darin had not violated the gag order because he did not discuss prohibited information.

At the end of that hearing, the trial court took up the State's motion to dismiss the appellant's court-appointed attorneys. The trial court asked Darin whether he had retained Mulder to represent the appellant for the trial. Darin replied that he had not and that he was unaware of any arrangements to have Mulder represent the appellant. The trial court then asked Mulder if he had been retained to represent the appellant. Mulder explained that he had been retained by Darlie Kee to assist the appellant's court-appointed attorneys. The trial court explained that Mulder could consult with Darlie Kee and the appellant's attorneys if they wished and that he could be present in the courtroom during the proceedings. But the trial court explained that Mulder was not counsel of record and could not question witnesses or make any objections or motions. There was a short recess, after which the trial court explained to Mulder that, if he wanted to become counsel of record, he would be required to file a formal motion for substitution of counsel.

Mulder filed a motion to substitute himself and three other attorneys for the appellant's appointed counsel. On October 21, 1996, the first day of jury selection, the trial court held a hearing on the motion. The uncertified record for the proceedings indicates that Mulder and three other attorneys had been retained by the appellant's family to represent her at the trial. Mulder was asked if he would be ready to start the trial right away, to which Mulder replied that he was ready to start without delay. The trial court asked the appellant whom she wanted to be her attorney. The appellant stated that she wanted Mulder to represent her at the trial. The trial court asked the appellant if she waived any potential conflict regarding Mulder's representation of Darlie Kee. The appellant responded that there was no conflict. The trial court granted the motion for substitution of counsel without mentioning Mulder's representation of Darin Routier.

On November 12, 1996, the State filed a motion to determine whether Mulder had a conflict of interest regarding his representation of Darin Routier. The State's motion stated that Mulder knew, when he was substituted as counsel for the appellant, that the State disbelieved the appellant's claim that the murders were committed by an unknown intruder. Mulder also knew that Darin Routier was the only other adult in the house that night, and that the State was continuing its investigation. The State then explained that "[r]ecent analysis of physical evidence suggest[ed] that Darin Routier may have participated with the [appellant] in the crime or coverup of the crime." It requested that the trial court hold a hearing to determine whether (1) a conflict existed for Mulder,

(2) the appellant would waive any potential conflict, and (3) Darin Routier would waive any potential conflict. The recent analysis of which the State spoke in its motion included a white tube sock found in the alley behind the Routiers' home on which was found the blood of both children, a faint trace of the appellant's DNA, and fibers from Darin's sneakers. Also, the knife that inflicted the children's and the appellant's wounds was found to have a head hair that matched a known sample of Darin Routier's head hair.

On the day the State filed its motion, the trial court discussed having a hearing on the motion. The trial court stated on the record that it believed that the appellant and Darin Routier had already waived any potential conflict on the first day that proceedings were conducted in Kerrville, October 21, 1996. The appellant agreed with the trial court that both she and Darin had waived any potential conflicts on that day. The prosecutor presenting the State's motion explained that the State had discovered new evidence and that the State wanted "to make real sure." The trial court said that it would hold a hearing after jury selection was completed.

On November 18, 1996, the trial court addressed the conflict motion on the record again. The trial court said, "On the 21st, as I recall, I put Ms. Kee under oath, Mr. Routier under oath, the [appellant], under oath for this purpose only. And they both waived any conflicts that may exist. Has anything happened since then?" One of the appellant's attorneys, Richard Mosty, replied, "Our response, that [the appellant] signed last week further reconfirms that." The response to which Mosty refers cannot be found in the record.

## B. Analysis

The appellant claims that Mulder's representation of Darin Routier while Darin was a suspect created a conflict of interest that foreclosed a strategy of shifting responsibility for the murders to Darin Routier. The appellant argues that this actual conflict requires reversal because the trial judge failed to have a hearing on the conflict.

The State claims that no conflict arose from Mulder's limited representation of Darin Routier for purposes of the gag order. Moreover, three other attorneys represented the appellant during the trial. The record does not show an actual conflict of interest of which the trial court should have been aware.

Ineffective assistance of counsel may result from an attorney's conflict of interest. *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Two different situations have been discussed by the United States Supreme Court regarding conflicts of interest. The distinguishing factor is whether the defendant or his attorney objected during the trial. *Compare Holloway v. Arkansas,* 435 U.S. 475, 484, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), *with Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

When the appellant or his attorney has brought a potential conflict of interest to the attention of the trial court, the Supreme Court has said that the trial court has an obligation to investigate and determine "whether the risk of the conflict of interest is too remote to warrant separate counsel." *Holloway,* 435 U.S. at 484, 98 S.Ct. 1173.

■ If the appellant and his attorney fail to bring the potential conflict to the attention of the trial court and the appealing defendant relies on the argument that the trial court should have been aware of the conflict, the defendant cannot obtain a

reversal on appeal unless he shows that his attorney was operating under an actual conflict of interest that adversely affected counsel's performance. *Sullivan,* 446 U.S. at 348, 100 S.Ct. 1708. No additional showing of harm or prejudice is required. *Id.* at 349–50, 100 S.Ct. 1708. We have said that an actual conflict of interest exists when "counsel is required to make a choice between advancing his client's interest in a fair trial or advancing other interests (perhaps his own) to the detriment of his client's interest." *James v. State,* 763 S.W.2d 776, 779 (Tex.Crim.App.1989).

The appellant claims a third category is suggested by *Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), when the prosecutor raises the issue and the "facts demonstrate convincingly the duty of the [trial] court to recognize the possibility of a disqualifying conflict of interest." *Id.* at 272–73, 101 S.Ct. 1097. In *Wood,* three defendants had been convicted of distributing obscene materials and placed on probation. The defendants had all been represented by an attorney hired by their employer. Their probation was later revoked. The employer's attorney represented them in the revocation hearing. The employer had promised the defendants that he would pay the fines imposed by the trial court when they were put on probation. The motion to revoke probation was filed because neither the defendants nor their employer paid the fines. The record indicated that the employer had an interest in creating equal protection jurisprudence favorable to him. The attorney's strategy in representing the employer's interest rather than the defendants' interest in obtaining leniency indicated that the attorney was actively representing the employer's interests and not those of the defendants. The defendants did not object to their attorney's conflict, but the State made the trial court

aware of the conflict. *Id.* at 265–67, 101 S.Ct. 1097.

The Supreme Court granted certiorari on an equal protection question but was unable to address it because the Court could not be sure that counsel was not influenced in his basic strategic decisions by the employer's interests. *Id.* at 264–65, 101 S.Ct. 1097. As a result, the Court remanded the case for the trial court to determine whether an actual conflict of interest existed. *Id.* at 273–74, 101 S.Ct. 1097. The Supreme Court has since made it clear that it did not create a third category in *Wood.*

In *Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), the Supreme Court corrected the lingering confusion left by *Wood.* In *Mickens,* the petitioner argued that the remand instruction in *Wood* created a rule that required reversal when a trial court fails to inquire into a potential conflict, even in the absence of the defendant's showing that the representation was affected by the conflict of interest. The petitioner found it significant that the remand order in *Wood* directed the trial court to grant a new probation revocation hearing if it found that an actual conflict of interest existed.

The Supreme Court explained that the reference to an actual conflict of interest in *Wood* meant a conflict that affected counsel's performance. "It was shorthand for the statement in *Sullivan* that 'a defendant who shows that a conflict of interest *actually affected the adequacy of his representation* need not demonstrate prejudice in order to obtain relief.'" *Mickens,* 535 U.S. at 171, 122 S.Ct. 1237 (quoting *Sullivan,* 446 U.S. at 349–50, 100 S.Ct. 1708) (emphasis added in *Mickens*). The Supreme Court said explicitly that it did not create a new rule of law in Wood. *Id.* at 172, 122 S.Ct. 1237.

### (1) Did the appellant object during trial?

The record indicates that neither the appellant nor her attorney objected to Mulder's representation on the basis that a conflict of interest existed. The State filed a motion requesting a hearing for the trial court to determine whether a conflict existed. In reference to the motion, the following colloquy occurred on November 12, 1996.

Trial Court: All Right. Let's put on the record. I have in my possession notice of motion, notice of possible conflict of interest, by Gregory Davis, an Assistant District Attorney from Dallas asking me to ascertain whether or not Mr. Mulder has any conflict of interest in this case. And I believe that the record will reflect that I have already asked these same questions of Mr. Mulder when we first started and that [the appellant] previously waived any conflict of interest. Is that not so, [appellant]?

Appellant: Yes, yes sir.

Trial Court: And I believe that your husband Darin Routier also knowingly and intentionally waived any conflict of interest.

Appellant: Yes, he did.

Trial Court: I think that was all in the record. Was it not?

Appellant: It was asked to us at the beginning when we changed.

Trial Court: That is my recollection of things.

Appellant: Yes, sir.

Trial Court: We did that the first day here, didn't we

Toby Shook: [27]I think so.

Appellant: We did it that day, but you had asked me when I was changing attorneys.

Trial Court: Yes, ma'am. But I mean in Kerrville. We did it right then and there.

Appellant: Yes.

Trial Court: As I recall it, it was the first day before the jury, change of venue and all that, before we got into jury selection.

Sherri Wallace: [28] Judge I think this is new evidence and Greg [Davis] just wanted to make real sure. There is some new evidence.

Trial Court: Well, I will tell you what will do. We will have a hearing all over and I will ask [the appellant] and I will ask Mr. Routier again. I'm sure we will see what the questions are.

Appellant: I know you have to go through that procedure but the questions will be—.

Trial Court: Well, I feel I will not be surprised at the same answers. Thank you. But we will do it after we get this jury picked.

Appellant: Yes, sir.

*Sic passim.*

Again, on November 18, 1996, the trial court referenced the State's motion.

Trial Court: Now I have several motions. I have a motion filed last week considering any conflict of interest that Mr. Mulder might have. The Routiers, I think, we have already waived that. We have got him on the record when they came down here the first day. Was it not Miss Halsey?

Court Reporter: Yes, sir.

---

**27.** Toby Shook is an assistant district attorney who represented the State during the trial in this case.

**28.** Sherri Wallace is an assistant district attorney who represented the State during the trial in this case.

Trial Court: On the 21st, as I recall, I put Ms. Kee under oath, Mr. Routier under oath, [the appellant] under oath for this purpose only. And they both waived any conflicts that might exist. Has anything new happened since then?

Richard Mosty: [29] Our response, that [the appellant] signed last week further reconfirms that.

Trial Court: That's right. She reconfirmed it last week. Now we can have a brief hearing when we start this on the 6th if everybody wants to, but I'm quite sure the answers will be the same.

*Sic passim.*

The record shows that the appellant, Mulder, and her other three attorneys made no objection on the basis of any potential conflict of interest on the basis of Mulder's representation of Darin Routier. As a result, the *Sullivan* standard applies, and to obtain relief, the appellant must show that (1) an actual conflict of interest existed, (2) which affected Mulder's representation of the appellant. *Sullivan,* 446 U.S. at 349–50, 100 S.Ct. 1708.

**(2) Has the appellant shown that an actual conflict of interest existed?**

The appellant argues that Mulder had an actual conflict of interest because there was a plausible alternative defensive strategy that he could not have pursued in the appellant's case without violating his duty of loyalty and confidentiality to Darin Routier, who was a suspect, a prosecution witness, and a former client in a substantially related case.

The State claims that Mulder represented Darin Routier for the gag order hearing only, which was not substantially related to the capital murder case. The State also claims that Mulder was not actively representing conflicting interests during the trial.

We have said that an actual conflict of interest exists when "one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also representing." *James v. State,* 763 S.W.2d 776, 779 (Tex.Crim.App.1989).

We agree with the State that Mulder's representation of Darin Routier was related only tangentially to his representation of the appellant. The only issue in the show-cause hearing was whether Darin had violated the order prohibiting potential witnesses in the case from discussing the expected testimony of the appellant or of any witness; the character, reputation, or credibility of any witness; the contents of any statement given by the appellant; and the nature of evidence that might be presented. The trial court found that Darin had not violated the gag order because he had not discussed any of the prohibited topics in his radio interview. As a result the trial court did not hold him in contempt. Mulder's minimal participation in Darin's defense at the gag order hearing cannot be said to be substantially related to Mulder's defense of the appellant in her capital murder trial.

Even if we were to accept the appellant's claim that the proceedings were substantially related, the appellant has not shown that any actual conflict of interest arose. *James v. State,* is analogous to this case. James and his co-defendant were tried in the same case and represented by

___

**29.** Richard Mosty is one of the attorneys who represented the appellant during the trial in this case.

the same attorney. Both defendants relied on alibi defenses that were independent of one another and the testimony at trial was consistent with the strategy that both defendants were innocent. On appeal James claimed that he could have shifted blame to his co-defendant if they had not had the same attorney. After explaining that no evidence supported that James was interested in pursuing this strategy, we said:

> What evidence we do have comes in the form of speculative argument from appellants' counsel on appeal, later adopted by the appeals court in analyzing the issue. Again in his response to the State's petition for discretionary review, appellant underscores the point that the appeals court opinion was based upon the "likelihood that the defense attorney could have, would have and should have" advanced evidence and arguments advantageous to each defendant but did not do so because of the multiple representation problem.

*Id.* at 781. We explained that a potential conflict may become an actual conflict, but we decline to speculate about a strategy an attorney might have pursued, but for the existence of a potential conflict of interest, in the absence of some showing that the potential conflict became an actual conflict.

We note that Mulder's representation of Darin did not amount to the joint representation at issue in *James*. Even if it did, nothing in the record supports a conclusion that an actual conflict of interest arose. Mulder did not know he was representing Darin until the morning of the gag order hearing. Also, Mulder had no direct knowledge of Darin's actions regarding the gag order; he put on no evidence in defense of Darin, who was never charged with any crime in connection with the murders. Darin and the appellant were not codefendants. The State never suggested during the trial that Darin was involved in the murders. During closing arguments of the guilt phase of the trial, the State focused on identity; prosecutors said that either an unknown intruder killed the two boys or the appellant did. They argued that the evidence supported finding the appellant guilty. The State also notes that Darin was a witness for the defense whose testimony was consistent with the appellant's theory of the case. The appellant testified that an unknown intruder stabbed her and her children and that Darin was not involved.

The appellant attempts to distinguish *James* on the bases that prejudice must be presumed because the trial court did not hold a hearing and that there was substantial evidence to support a plausible alternative defensive theory.

As we explained above, prejudice is not presumed just because the trial court failed to hold a hearing after the State's motion was filed. We presume prejudice from the failure to hold a hearing only when the defendant or her attorney objects on the basis of a potential conflict. In the absence of an objection, the defendant is required to show that an actual conflict of interest existed that adversely affected the representation.

In *James*, we distinguished other cases in which we had held that an actual conflict developed during the trial. Those cases were *Ex parte McCormick*, 645 S.W.2d 801 (Tex.Crim.App.1983), *Ex parte Parham*, 611 S.W.2d 103 (Tex.Crim.App.1981), and *Gonzales v. State*, 605 S.W.2d 278 (Tex. Crim.App.1980). In each case, the record demonstrated that counsel had to forego an effective strategy or that a strategy backfired due to an actual conflict that arose during trial. We said:

> In each of these cases the potential for conflict inherent in multiple representation became an actual conflict due to the

inculpatory or exculpatory nature of testimony or the strategy adopted by defense counsel in the particular case. That is not reflected in the case before us today. Each appellant had a distinct alibi supported, albeit sometimes weakly, by separate witnesses. Each appellant testified, in effect bolstering both alibi defenses. There is no conflict between the testimony of these appellants, the testimony in effect bolstering an individual appellant's own defense, a potential conflict does not rise to the level of an actual conflict of interest. In line with this, we hold that the testimony between alibi witnesses for appellants in no way conflicted with either defense, and an actual conflict of interest has not been shown.

*James*, 763 S.W.2d at 781–82 (citation omitted). The appellant's case is more analogous to *James* than to *McCormick*, *Parham*, and *Gonzales*. The record does not support the conclusion that Mulder's representation of both the appellant and Darin Routier created a situation in which Mulder had to forego a strategy in the appellant's trial that he would have otherwise pursued if he had not represented Darin Routier.

We hold that no actual conflict of interest existed regarding Mulder's representation. As a result, we overrule the appellant's first point of error.

## III. Eighth, Ninth, and Tenth Points of Error: Dismissal of Sworn Juror

In the appellant's eighth, ninth, and tenth points of error, she claims that the trial judge violated her right to counsel, her right to be present, and Article 36.29 when he had an unrecorded ex parte communication with an unnamed person who provided the only basis for finding that a sworn juror was disabled.

At the beginning of the proceedings on January 16, 1997, just before the State was to present its case-in-chief, the trial court announced that one of the jurors was disabled and unable to continue. The trial court replaced the disabled juror with an alternate. The appellant requested a continuance to determine whether, in fact, the juror was disabled as required by Article 36.29. The juror had attended trial proceedings until that day. The trial court responded that the juror had had the flu the day before, that she struggled to come to the proceedings, and that she had become bedridden. The appellant objected on the basis that it violated Article 36.29(b). The trial court overruled this objection. The appellant made no other objections, and the trial court proceeded with the trial with the alternate juror. The next day, the trial court admitted a photocopy of a note from the disabled juror's physician.

### A. Violation of right to counsel and right to be present

■ The appellant claims that the trial court violated her Sixth Amendment right to counsel and her right to be present during a critical stage of her trial by engaging in an unrecorded ex parte communication about the discharged juror's disability when her lawyer was not present. The appellant objected on the basis that the trial court's decision violated Article 36.29. Because the objection at trial does not comport with her complaint on appeal, these complaints are not preserved for review. Tex.R.App. P. 33.1(a).

The appellant claims that her failure to object on these bases were preserved without objection because the State must show a valid waiver of those constitutional rights. The record contains no evidence of a waiver, and therefore she argues, the complaint was preserved. The State ar-

gues that even constitutional claims can be forfeited by the failure to assert them. *See Marin v. State,* 851 S.W.2d 275, 279 (Tex.Crim.App.1993).

■ Even if we assume that the appellant did not need to object to preserve these complaints; the appellant still cannot prevail. The appellant has not shown that her rights to due process and counsel were violated.

The appellant relies on *U.S. v. Santiago,* 977 F.2d 517 (10th Cir.1992), in support of her claim. In that case, during defense counsel's closing argument, a juror became ill and had to be excused. The defendant initially objected to using the only alternate juror because during voir dire Santiago said that she had heard another prospective juror comment that the entrapment defense was ridiculous. The trial court conducted an ex parte examination of the alternate juror on the record. Once satisfied that the juror could render an unbiased verdict, the trial court allowed the parties to view the transcript of the examination. The defendant made no further objections. As a result, the Tenth Circuit reviewed the case for plain error. *Id.* at 521–22. The Court conducted a detailed analysis addressing the appellant's right to be present and concluded that a defendant's due process right to be present did not extend to situations that did not involve the confrontation of witnesses or evidence related to her ability to defend against the charge. *Id.* at 522.

The Tenth Circuit relied on *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), in which the Supreme Court said that "[t]he defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication." *Id.* at 526, 105 S.Ct. 1482. This is because the

right to be present is largely derived from the defendant's right to confront witnesses against her. *Ibid.* Although the Court was directly addressing whether the defendant had a due process or confrontation right to be present, the analysis applies with equal persuasion regarding the appellant's right to have her counsel present.

The Supreme Court explained that it has recognized that the right to be present does extend to some situations in which the defendant "is not actually confronting witnesses or evidence against him." *Ibid.* As we explained above, in *Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), the Supreme Court outlined the parameters of a defendant's due process right to be present during trial. The Court said "whenever [the defendant's] presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge" the defendant has a right to be present. The "presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.* at 105–106, 108, 54 S.Ct. 330.

The appellant claims that she had a right to be present and have her counsel present at all critical stages of her trial. This is true, but the circumstances about which the appellant complains did not constitute a critical stage. The trial court's learning that the juror was ill and could not continue was not a critical stage in the trial. The appellant was present when the trial court dismissed the juror, and she was able to make objections at that time. We cannot say that the absence of the appellant and her counsel when the trial court received information about the juror's illness thwarted the appellant's right to a fair and just determination of her guilt and punishment in this case. We overrule

the appellant's eighth and ninth points of error.

### B. Violation of Article 36.29

■ In her tenth point of error, the appellant claims that the trial court violated Article 36.29 in replacing the disabled juror when there was no evidence in the record to show that the juror was disabled. The State claims that the trial court did not abuse its discretion.

■ Article 36.29 provides:

If alternate jurors have been selected in a capital case in which the state seeks the death penalty and a juror dies or becomes disabled from sitting at any time before the charge of the court is read to the jury, the alternate juror whose name was called first under Article 35.26 of this code shall replace the dead or disabled juror. Likewise, if another juror dies or becomes disabled from sitting before the charge of the court is read to the jury, the other alternate juror shall replace the second juror to die or become disabled.

The determination as to whether a juror is disabled is within the discretion of the trial court, and absent an abuse of that discretion, no reversible error will be found. *Brooks v. State,* 990 S.W.2d 278, 286 (Tex. Crim.App.1999). We have said that a disability for purposes of Article 36.29 includes "any condition that inhibits a juror from fully and fairly performing the functions of a juror." *Reyes v. State,* 30 S.W.3d 409, 411 (Tex.Crim.App.2000).

In this case, the trial court received information that the juror was bedridden with the flu. The following day, a letter from the juror's doctor was admitted, without objection, indicating that the juror was ill. Without more we cannot say that the trial court abused its discretion in replacing the disabled juror with an alternate. We overrule the appellant's tenth point of error.

### III. Sixth and Seventh Points of Error: Evidentiary Question

In the appellant's sixth and seventh points of error, she complains that the trial court abused its discretion under Texas Rule of Evidence 614 [30] and violated the appellant's right to federal due process when it excluded testimony from the appellant's private investigator about a prior inconsistent statement made by the State's blood spatter expert.[31] The appellant argues that the evidence was strong and absolutely crucial to her defense. The State argues that the record shows that the trial court did not abuse its discretion because the appellant's attorneys knew the investigator was in the courtroom and knew his status as a potential impeachment witness. In addition, the State argues that the impeachment testimony would have been of minimal value.

Before testimony began in the trial, the State requested that the trial court invoke Rule of Evidence 614 to keep witnesses out of the courtroom while not testifying. The appellant's investigator was present in the courtroom throughout the appellant's trial, and he was not excused from the rule. The State's blood spatter expert, Tom Bevel, testified that he found four cast-off or spatter bloodstains on the nightshirt the appellant had been wearing on the night of the murder. All of the

---

**30.** At the time of the appellant's trial it was Texas Rule of Criminal Evidence 613.

**31.** Within the appellant's analysis of points of error six and seven she argues that the excluded testimony should have been admitted under the rule of optional completeness. The appellant did not object on this basis at trial, and thus, has failed to preserve error. Tex. R.App. P. 33.1.

stains contained some of the appellant's blood and some of the blood of either Damon or Devon.

Bevel testified that the stains could be either (1) two separate stains with the appellant's blood overlaying the child's blood or (2) a mixture of both the appellant's blood and the child's blood. Bevel said that if the stains were a mixture, it would show that the appellant had been cut before the stain was deposited, which is inconsistent the State's theory that the appellant stabbed the children first before inflicting her own wounds. If the stains were overlaid, it would be consistent with the State's theory of the case. Bevel testified that at least one of the stains appeared to be mixed, not overlaid. He testified that the other three could have been overlaid stains.

Defense counsel cross-examined Bevel about statements made to three of the appellant's attorneys and the appellant's investigator, Lloyd Harrell. Specifically, defense counsel asked Bevel whether he had said that the four stains were mixed rather than overlaid. Bevel responded:

> Bevel: I told you there was some mixed blood. I don't know if we specifically addressed that stain. I don't recall.
>
> Defense: Well, you told us that in your judgment, that that was mixed blood in one stain?
>
> Bevel: I don't recall specifically stating that it was one stain. Now, which one are we referring to here?

Defense: I'm talking about these, I'm talking to all four of them on the front of the shirt, all four of them mixed?

> Bevel: The only one that I can say is really consistent without any hesitation, is the one that is up in this area here, which is going to be LS–1.
>
> Defense: You are talking about the highest one on the left shoulder?
>
> Bevel: That is correct.
>
> Defense: Okay. But you didn't tell us when we were up there that you thought all of those others were a stain that was mixed before it hit the shirt?
>
> Bevel: I don't believe so.

The trial court prohibited Harrell's testifying before the jury also. The trial court said, "All right. Same ruling.[32] So let's get on with making your Bill, whatever you want to do." [33]

Outside the presence of the jury, Harrell testified that he and three of the appellant's attorneys traveled to Oklahoma City to interview Bevel. In Harrell's opinion, the statements that Bevel made in Oklahoma City were "materially different" from his testimony at trial. Harrell testified that, during the interview, Bevel had said that all four of the stains were mixtures. Harrell said he was certain of this because he asked Bevel at least twice, "does this mean that each of those blood stains, the knife had to contain the blood of Darlie and the blood of one of her children?" Bevel had responded, "yes," according to Harrell.

---

32. This is a reference to the trial court's ruling on another proposed witness. The trial court had said in reference to that witness, "Well, do a Bill then, because I'm not going to let—anybody who has been in the courtroom is not going to testify. That is my discretion, and so I'm going to exercise my discretion and not let her testify."

33. As we discuss below, Rule 614 is not a per se exclusionary rule. Trial courts should perform the balancing test set out in *Webb v. State*, 766 S.W.2d 236, 244 (Tex.Crim.App. 1989).

On cross-examination, the State asked Harrell if he had recorded the approximately four-hour meeting with Bevel. Harrell said that he had not and that he had not asked Bevel if he would allow the defense team to record the conversation.

### (A) Rule of Evidence 614

 Rule of Evidence 614 contains what has been commonly referred to as "the Rule." When a party invokes the Rule, or it is invoked on the court's own motion, the trial court orders witnesses to remain outside the courtroom.[34] There are exceptions to the Rule: the parties, people who are shown to be essential to a party's case, and generally the victim of the offense. Tex.R. Evid. 614. The Rule is designed to prevent witnesses from altering their testimony, consciously or not, based on other witnesses' testimony. *Webb v. State,* 766 S.W.2d 236, 239 (Tex. Crim.App.1989).

There are basically two situations that arise under Rule 614. One is when a party complains of the admission of evidence in violation of the Rule. In those cases, we look at whether the complaining party objected and was harmed. *Id.* at 240. The other situation that can arise under Rule 614 is when a witness is excluded. *Ibid.* In cases arising from the exclusion of a defense witness, the trial court must consider the competing interest of the defendant's right to defend himself. *Id.* at 240. Rule 614 contains no provision for sanctions for a violation. In *Webb v.*

*State,* we explained that when a trial court decides whether to disqualify a witness under the Rule, the trial court must balance the interests of the State and the accused, consider alternative sanctions, and consider the benefit and detriment arising from a disqualification in light of the nature and weight of the testimony to be offered. *Id.* at 244.

In *Webb,* we formally adopted a test to apply when a witness was prohibited by the trial court from testifying because the witness was present in the courtroom during the trial. The appellate court determines:

> (1) if the rule was violated and the witness disqualified, were there particular circumstances, other than the mere fact of the violation, which would tend to show the defendant or his counsel consented, procured or otherwise had knowledge of the witness's presence in the courtroom, together with knowledge of the content of that witness's testimony; and (2) if no particular circumstances existed to justify disqualification, was the excluded testimony crucial to the defense.

*Id.* at 245.

The second part of the analysis is dispositive of the appellant's case. The testimony Harrell provided cannot be said to be crucial to the appellant's defense. In *Webb* we said that for a defendant to prevail, he must show that the evidence "was

---

**34.** The text of Rule 614 reads:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of:
(1) a party who is a natural person or in civil cases the spouse of such natural person;
(2) an officer or employee of a party in a civil case or a defendant in a criminal case that is not a natural person designated as its representative by its attorney;
(3) a person whose presence is shown by a party to be essential to the presentation of the party's cause; or
(4) the victim in a criminal case, unless the victim is to testify and the court determines that the victim's testimony would be materially affected if the victim hears other testimony at the trial.

'extraordinary' in the sense that it was crucial to his defense." *Webb*, 766 S.W.2d at 245. In that case, we held that the excluded witness's testimony was crucial for several reasons. *Id.* at 245–46. We noted that the witness's testimony was probative of an accomplice witness's credibility and the defense's theory of the case. She also provided evidence of other witnesses' motives for testifying as they did. The excluded witness was the only witness who could corroborate the defendant's claim that another person had been involved in the offense.

In *Davis v. State*, 872 S.W.2d 743 (Tex. Crim.App.1994), we said that "simply because the excluded testimony is not the only evidence supporting a defensive theory does not mean that it is not crucial to such defensive theory." *Id.* at 746. We held that the testimony of an excluded witness was crucial because it corroborated other evidence favorable to the defense that the jury would have been more inclined to believe had the excluded testimony been admitted. *Ibid.*

This case is distinguishable from those cases. First, Harrell's testimony would not have been admissible as substantive evidence that the stains Bevel testified about were mixed as opposed to overlaid. Harrell's testimony was admissible for impeachment purposes only, unless the statement came within an exception to the general prohibition of hearsay. Tex.R. Evid. 801 & 802; *see* 1 Steven Goode, Olin Guy Wellborn III, M. Michael Sharlot, Texas Practice Guide to the Rules of Evidence § 613.2, at 796–97 (3d ed.2002). We see no exception to the hearsay rule that would allow the jury to consider Harrell's testimony as substantive evidence of the appellant's innocence. If he had been allowed to testify, the State would have been entitled to a limiting instruction on that basis.

It is possible that either Bevel misunderstood Harrell's questions or that Harrell misunderstood Bevel's answer. As commentators have explained, "The fact of inconsistency does not by itself reveal whether the witness is lying or is simply mistaken. Nor does it indicate which (if either) of the statements—the trial testimony or the previous inconsistency—is the correct one." 1 Steven Goode, Olin Guy Wellborn III, M. Michael Sharlot, Texas Practice Guide to the Rules of Evidence § 613.2, at 796 (3d ed.2002). The record does not reveal, and the appellant does not suggest, that Bevel had a motive to present different information at trial.

Next, Bevel's testimony was, at worst, neutral. He said that, in his opinion, one of the stains was mixed. This tended to support the appellant's theory of the case. He said that he could not be certain about the other three stains. This testimony was not highly probative of the question of the appellant's guilt. We cannot say that the trial court abused its discretion under Rule 614 in excluding Harrell as a witness.

### (B) Due Process

Next, we address whether the trial court violated the appellant's federal due process right to call witnesses for her defense. The appellant's due process argument consists of stating that, "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). She goes on to say that a defendant's due process right to present her defense must be balanced against the State's interest in enforcing the rule. The appellant cited *Holder v. United States*, 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893), *Davis*, 872 S.W.2d at 745, *Webb*, 766 S.W.2d at 244, and *Braswell v. Wainwright*, 463 F.2d 1148, 1152 (5th Cir.1972). No other au-

thority or argument for the appellant's claim is presented.

In *Holder v. United States*, the Supreme Court addressed a situation in which a witness, who had been in the courtroom, testified when no objection was made on the basis of the Rule until after he testified. The Supreme Court said that trial courts may not prevent a witness from testifying solely on the basis that they violated the Rule. *Holder*, 150 U.S. at 92, 14 S.Ct. 10. In this case, the trial court did not give a reason beyond the violation of the Rule for excluding the testimony. But the trial court could have found, as we have concluded, that Harrell's testimony was not crucial to the defense. The other cases cited by the appellant in support of her case are distinguishable on that basis. We overrule the appellant's sixth and seventh points of error.

Having found no reversible error, we affirm the trial court's judgment and sentence.