IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,913




 


KENISHA ERONDA BERRY, Appellant



v.



THE STATE OF TEXAS






ON DIRECT APPEAL

FROM CAUSE NO. 89,642 IN THE 252ND DISTRICT COURT

JEFFERSON COUNTY




 Hervey, J., filed a dissenting opinion in which Keller, P.J., Meyers and Keasler,
JJ., joined. 

DISSENTING OPINION


 I respectfully dissent. At the very least, a rational jury could have found that there is a
probability that appellant would be dangerous to her unwanted babies. A rational jury could even
have found that appellant would, in fact, be very dangerous to that segment of society. This should,
as a matter of appellate review, be dispositive of appellant's sufficiency challenge to the jury's
finding on the future-dangerousness special issue.

 The Court nevertheless decides that the State failed to meet its burden of proof on the future-dangerousness special issue. The Court's opinion states:

 We hold that the state did not meet its burden of proving beyond a reasonable doubt
that there is a probability that appellant, if allowed to live, would commit criminal
acts of violence in the future so as to constitute a continuing threat, whether in or out
of prison. (Citation omitted). Appellant murdered one child and abandoned
another[ (1)], but defense witnesses testified that these two incidents were out of
character and that she was a loving and caring mother to her other three children. 
Appellant's expert witnesses opined that she was depressed and under extreme stress
when she killed Malachi and abandoned Paris. She had no criminal record, and the
state presented no other evidence of violence in her past. Each of her offenses
involved a pregnancy, but testimony from both defense and state witnesses showed
that her potential for becoming pregnant while incarcerated would be "extremely
low." Further, appellant was in her twenties when she was convicted of capital
murder. If she received a life sentence and were paroled forty years later, she would
likely be beyond her childbearing years and thus could not repeat such an offense. 
The state's evidence, which consisted of appellant's murder of Malachi, her
subsequent abandonment of Paris, her lack of remorse for these crimes, and the
unlikely possibility that she might become pregnant in prison, does not prove beyond
a reasonable doubt that there is a probability that she would commit criminal acts of
violence that would constitute a continuing threat to society.


Maj. op. at 23-24.

 

 This analysis does not "view the evidence in the light most favorable to the verdict." See
Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). It credits evidence and inferences therefrom that
a rational jury could have rejected and discredits other evidence and reasonable inferences therefrom
upon which a rational jury could have based an affirmative answer to the future-dangerousness
special issue. But see id. (sufficiency standard does not permit appellate court "to make its own
subjective determination"). This usurps the jury's role and places the Court in the role of asking
whether it believes, instead of asking whether a rational jury could have believed, that there is a
probability that appellant would be dangerous. But see id.

 The State presented evidence that in 1998 appellant murdered her new-born child named
Malachi by duct-taping his mouth shut while still alive, by duct-taping his arms to his side to
immobilize him, and by placing Malachi in a garbage bag and throwing him in a trash dumpster
where he suffocated to death. Five years later, appellant tried to murder another of her new-born
children named Paris by placing Paris, naked, on a fire-ant mound at a remote location where it was
extremely unlikely that Paris would be found alive. These were calculated crimes conceived and
carried out by appellant alone apparently with the motive to keep the father of her other three
children from discovering that she was "messing" with someone else. Appellant has shown no
remorse whatsoever for her attempted and successful acts of infanticide. She has failed to take any
responsibility for Malachi's death. She blamed someone else for trying to murder Paris, but this
deception could not withstand scrutiny. She "plead the Fifth" and accused the prosecutor of having
a "personal vendetta" against her when the prosecutor began to question her at trial about how Paris
ended up naked on a fire-ant mound in a remote location. (2)

 Q. [PROSECUTION]: What did you do with Paris?


 [THE DEFENSE]: Your Honor, I have to object to any reference to any extraneous
matter that's not appropriate for this jury.


 [THE COURT]: Overruled.


 [THE PROSECUTION]: I submit 404(b), Your Honor, to show intent.


 Q. What did you do with Paris?


 A. [APPELLANT]: (No response)


 [THE DEFENSE]: And Your Honor, we would also object under 404(b) that the
prejudicial effect outweighs any probative value to that particular thing.


 [THE COURT]: That's overruled.


 Q. Didn't you take Paris out on Hillebrandt Road and dump her in an ant bed?


 A. I plead the Fifth.


 Q. You can't plead the Fifth.


 A. Well, I am.


 Q. Because you're on the stand. Tell the jury what you did to Paris, Ms. Berry.


 A. This is my trial about Malachi, not Paris.


 Q. Tell the jury what you did to Paris.


 A. I'm charged with capital murder. Paris is still alive.


 [THE PROSECUTION]: I would ask the Court to instruct the witness to answer the
question.


 [THE COURT]: Ms. Berry, I'm going to instruct you to answer the question.


 A. This is a capital murder trial.


 Q. You took Paris out on Hillebrandt Road last summer and dumped her in an ant
bed; and she's alive, isn't she? I saw her today.


 A. Really?


 Q. Yes, complete with the scars from the ant bites. Tell the jury what you did to
Paris.


 [THE DEFENSE]: Your Honor, I have to object. For one thing, the prosecutor's
screaming; and I think that's inappropriate in the courtroom. And secondly, the
prosecutor's testifying as to what he's seen and if he wants to take the stand, I'll be
happy to cross examine him, but he's not a witness.


 [THE COURT]: Overruled. Ms. Berry, I'm going to instruct you again to answer the
question.


 [APPELLANT]: It's okay that he's yelling. It's a personal vendetta that he got
against me.


 [THE PROSECUTION]: I would once again ask the Judge to instruct Ms. Berry to
answer the question.


 [THE COURT]: Ms. Berry, I'm going to instruct you again to answer the questions
that he's asking you.


 [APPELLANT]: If it don't have nothing to do with this trial-

* * *

 Q. Tell the jury what you did to Paris.


 A. You tell them.


 Q. What did you do to her, Ms. Berry? Did you do anything to her?


 A. (No response)


 Even appellant's own expert (Gripon) provided testimony that supports a finding that there
is a probability that appellant would be dangerous in the "free world" to her unwanted babies.

 Q. [PROSECUTION]: If she gets in a circumstance where she is around a child that
she doesn't want or doesn't care for in the future, what do you think she's going to
do?


 A. [GRIPON]: Well, I don't think that's going to happen.


 Q. But if it does-


 A. Given her circumstances. If it were a child that she had given birth to under
similar circumstances to those that we've looked at here, I would consider that a high
risk situation. In other circumstances, I would not consider it to be substantially risky
at all; but I certainly would not suggest that she become pregnant and give birth in
an unsupported setting alone and face whatever kind of impact she feels that would
have on her life, if that were possible, although I can't conceive of a set of
circumstances in which that's possible.


 Q. But she's already done it five times.


 A. Done what, given birth?


 Q. Getting pregnant without people knowing.


 A. Well, I don't know whether all of those were unknown. I know that most were. 
That's true.


 During closing jury arguments at the punishment phase, the prosecution stated to the jury that
the way to answer the future-dangerousness special issue was if appellant "was out and she's among
her children or she has another child, do you think she's a future danger to that child." The
prosecution also deduced from the evidence that appellant is "evil" and asked the jury to "imagine
someone more evil than would do these two things to two different children on two different days
five years apart."

 Now, you've heard a bunch of testimony. You've heard about future danger and you
heard Dr. Gripon, who was hired by the defense and he said that she's not a future
danger because the victim pool was low because in prison she's not going to have
access. Remember we talked to you about what society was. We talked about it for
a long time. Society-when I talked to you guys-I'm going to do this. Imaginary
circle-what does society mean to you folks? You-all agreed it was anyone around
her. And we all asked you, when you're asking yourself that question, you have to
assume whether she's a future danger sitting there as she sits today, if she was out
among us, among other children, is she a future danger. Everything Dr. Gripon said
was based on one premise, that she's locked up and that somebody, not her,
somebody else, would intervene to protect that child. Remember, he said, oh, she'll
be locked up. Well, that assumes the system is locking her up. Well, somebody
would catch her. That assumes somebody else will see that she's pregnant,
somebody that's more perceptive than the family that she's hid all these pregnancies
from. That assumes that even after she has the baby that they could intervene and get
to her. That assumes that she's locked up.


 I submit to you the way you answer this question is if she was out and she's among
her children or she has another child, do you think she's a future danger to that child. 
What was not asked of Dr. Gripon was how many victims in her way does it take to
convince him or anybody that she's a future danger. A person repeatedly trying to
kill her children, I submit to you, that is an obvious answer. Regardless of what the
answer to your second question is, the first one should be a resounding "yes." She
murdered [Malachi]. She lied to Dr. Gripon, "Oh, I didn't do it." So, did he assume
that she's telling him the truth; or do you assume she was lying? The material-the
information he bases his answers on were partially based on the story from her. And
you got a big taste of her yesterday. She's still lying. She lied to her family, she lied
to Gripon and she lied to you. So, how many children do we have to bury before
you're convinced that she's a future danger? Some of you-all said one. I would hope
all of you say two.

* * *

 There is an evil and dark side to this woman that her family does not know. There
is an evil and dark side to this woman that very few people have realized until we see
what she creates because the opposite of creation is destruction; and she has
destroyed lives everywhere she goes. And you ask yourself is she a future danger
today, was she a future danger in 1996 when she had her first baby, oh, yeah. Was
she a future danger in 1997, was she a future danger in 1998, was she a future danger
on June the 5th of 2003, the day before she dropped her most recent child into a fire
ant bed. What has changed from that day to today as she sits there? Absolutely
nothing, absolutely nothing.


 There has been no showing of remorse. There has been no showing of psychological
damage or drug abuse. She came from a beautiful home with a loving family. Some
people are just evil. Some people are just evil. And I want you to imagine someone
more evil than would do these two things to two different children on two different
days five years apart.


 The future-dangerousness special issue asks the jury to decide "whether there is a probability
that the defendant would commit criminal acts of violence that would constitute a continuing threat
to society." See Article 37.071, § 2(b)(1), Tex. Code Crim. Proc., (emphasis supplied). The
Court's opinion also seems to acknowledge that this special issue asked the jury to decide if there
is a probability that appellant would be dangerous "in or out of prison." Maj. op. at 23 ("state did
not meet its burden of proving beyond a reasonable doubt that there is a probability that appellant,
if allowed to live, would commit criminal acts of violence in the future so as to constitute a
continuing threat, whether in or out of prison"); see Salazar v. State, 38 S.W.3d 141, 145-46
(Tex.Cr.App. 2001) (defendant, who was convicted of murdering two-year-old daughter of his
girlfriend, presented expert witness who admitted that defendant would be dangerous in the "free
world"); Smith v. State, 898 S.W.2d 838, 851 n.19 (Tex.Cr.App. 1995) (future dangerousness special
issue requires jury to decide if the defendant would be dangerous "whether he is in prison or out of
prison"). (3) This is also consistent with the State's closing jury arguments during the punishment
phase that appellant would be dangerous "if she was out and she's among her children or she has
another child."

 The future-dangerousness special issue, therefore, does not exempt from the death penalty
those defendants who are dangerous only to a segment of society that they probably will not
encounter in prison or are not likely to encounter again if they are paroled forty or so years later. See
Footnote 3. If that was true, the future-dangerousness special issue would exempt from the death
penalty most parents who murder their children, contrary to the clear legislative intent expressed in
Section 19.03(a)(8) making it a capital offense for a person to murder "an individual under six years
of age." It would also exempt from the death penalty many other killers such as children who
murder their parents and middle-aged serial killers who prey on young children.

 In this case, a rational jury could have found that there is a probability that appellant would
be dangerous "out of prison." She cold-heartedly murdered one child and attempted to murder
another child on different occasions five years later. She is unremorseful and fails to take
responsibility. This evidence satisfies every measure of future-dangerousness that this Court has
applied. See, e.g., Salazar, 38 S.W.3d at 145-46 (lack of remorse and failure to take responsibility
are factors that support jury's affirmative answer to "future-dangerousness" special issue). (4) A
rational jury could have found that appellant is the same unremorseful, cold-blooded killer that she
was in 1998 when she murdered Malachi and that she was in 2003 when she tried to murder Paris. (5) 
That appellant might be controlled in prison in no way detracts from this or a rational finding that
there is a probability that she would be dangerous to her unwanted children.

 I respectfully dissent.

 Hervey, J.


Filed: May 23, 2007

Publish
1. It is not entirely accurate to merely state that appellant abandoned Paris. A rational jury could
have found that it was appellant's conscious desire to kill Paris.
2. Appellant had testified on direct-examination that Malachi died a natural death and that she
duct-taped him and threw him in the garbage. She never explained, on either direct-examination or
on cross-examination, what happened to Paris. 
3. The Legislature's use of "would" instead of "will" in the future-dangerousness special issue
also supports the claim that this special issue asked the jury to decide, among other things, whether
there is a probability that appellant would be dangerous "if she was out among us." It is not
dispositive of appellant's sufficiency claim that she might not murder any more of her children
because of a low probability that she will not have any more children, if sentenced to life in prison. 
This Court has held that "society includes not only free citizens but also inmates in the penitentiary." 
See McDuff v. State, 939 S.W.2d 607, 620 (Tex.Cr.App. 1997); Jones v. State, 843 S.W.2d 487, 495
(Tex.Cr.App. 1992). 
4. This evidence satisfies at least five of the eight "non-exclusive list of factors that may be
considered in determining whether a defendant constitutes a continuing threat to society" set out in
numerous decisions of this Court such as Solomon v. State, 49 S.W.3d 356, 362-63 (Tex.Cr.App.
2001). These non-exclusive factors are:


 (1) the circumstances of the capital offense, including the defendant's state of mind
and whether [s]he was acting alone or with other parties;

 (2) the calculated nature of the defendant's acts;

 (3) the forethought and deliberateness exhibited by the crime's execution;

 (4) the existence of a prior criminal record and the severity of the prior crimes;

 (5) the defendant's age and personal circumstances at the time of the offense;

 (6) whether the defendant was acting under the duress or the domination of another
at the time of the commission of the offense;

 (7) psychiatric evidence; and

 (8) character evidence. 
5. Appellant is not very different from other defendants who have been convicted and sentenced
to death for murdering their children. See, e.g., Routier v. State, 112 S.W.3d 554, 557 (Tex.Cr.App.
2003); O'Bryan v. State, 591 S.W.2d 464, 467-70,480-81 (Tex.Cr.App. 1979).