Opinion filed April 15,
2010

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                        No.  11-08-00133-CR

                                                    __________

 

                         THOMAS
JACINTO LOPEZ, III, Appellant

 

                                                             V.

 

                                      STATE
OF TEXAS, Appellee



 

                                   On
Appeal from the 385th District Court

 

                                                          Midland
County, Texas

 

                                                   Trial
Court Cause No. CR33628

 



 

O
P I N I O N

            The
jury convicted Thomas Jacinto Lopez, III of theft over $100,000 but less than
$200,000.  Based on the trial court’s finding of “true” on a prior felony
conviction alleged for enhancement purposes, the trial court sentenced
appellant to confinement in the Institutional Division of the Texas Department
of Criminal Justice for a term of forty-five years.  The trial court also
ordered appellant to pay restitution of $108,344.  Appellant challenges his
conviction in four issues.  We affirm.

Background
Facts

            Kay
Stephenson Hill and Thomas Leroy Hill met appellant on July 25, 2006, when he
stopped by their home to see if they might be interested in hiring him to
perform some repairs on their home.  Appellant told the Hills that, while
driving by their home, he had observed some loose bricks and exterior areas
that needed to be repainted.  He informed them that he had a work 

crew in the area
that could perform these repairs.  After discussing the scope of the repairs,
the Hills executed a written contract with appellant on July 25, 2006, for him
to repair the loose bricks and perform other miscellaneous repairs around the
home for the total price of $4,871.25. The Hills paid appellant a down payment
of $2,500 at the time that the initial written contract was executed. 

            Appellant
and his crew started working on the Hills’ home within a couple of days after
executing the initial written contract.  Soon after appellant began working on
the Hills’ home, he and the Hills entered into a discussion about their desire
to make additional changes to their home.  Appellant and the Hills executed a
second written contract for him to install new windows, a French door, and a
new garage door at their home for a total price of $13,085.  This contract also
included additional work to repair loose bricks around the Hills’ home.  The
Hills paid appellant an additional $5,456 as a down payment on the second
written contract. 

            On
August 11, 2006, the Hills executed a third written contract with appellant for
him to install handicap accessible sidewalks and driveways around their home to
accommodate Mrs. Hill’s use of a wheelchair.  The total price of this
written contract was $13,531.25 of which the Hills paid $6,500 at the time of
its execution as a down payment.  Accordingly, the Hills had executed three
written contracts with appellant within three weeks of their initial meeting
for him to perform work on their home in the total amount of $31,487.50.  

            During
the course of appellant’s work on the Hills’ home, he reported additional items
to them that were purportedly in need of repair.  One of these items involved
their chimney.  Appellant informed the Hills that their chimney could
potentially be leaking dangerous gas into their home.  Other items “discovered”
by appellant included the lack of adequate foundation underneath the house, deficient
ceiling trusses, termite damage in the attic, and insufficient insulation.  Appellant
agreed to repair these items for the Hills for  additional compensation.  

            Appellant’s
work on the Hills’ home extended into 2007.  The working relationship between
appellant and the Hills deteriorated during the course of the project.  Mrs.
Hill testified that appellant began failing to show up with his crew to work on
the house and that he was often late or unprepared to do the work that he and
his crew were scheduled to do on a given day.  She testified as follows in this
regard:  “What we learned was that he was not going to be there when 

he said he would
be there; and when he came, he would not be ready to work; and when he worked,
he wouldn’t get the work done that he said he would do.”

            Mrs.
Hill testified that appellant’s work on their home came to a halt for a
two-week period in February 2007.  Virtually every project that appellant had
agreed to perform remained unfinished at this time.  Mrs. Hill estimated that
appellant had not completed two-thirds of the work on the house as of this
time.  When the Hills threatened appellant with legal action, he resumed work
on the house.  Appellant and his crew worked on the house for three additional weeks,
but then he stopped working again.  Mrs. Hill estimated that appellant had
completed one-half of the work on the house as of this time.

            As
of April 2007, the Hills had made payments in excess of $161,000 to appellant. 
A part of these payments consisted of $15,735.54 that appellant charged the
Hills for fees and bonds that he purportedly was required to purchase from the
City of Midland in order to perform work on their home.[1] 
Frustrated by appellant’s lack of performance, the Hills contacted the building
inspector for the City of Midland, Richard Schwope, to determine if appellant
had obtained the necessary permits for their remodeling project.  Schwope
determined that appellant had not obtained any permits for working on the
Hills’ home.[2]  Schwope
additionally determined that appellant had not submitted proof of a surety bond
to the city as required by city ordinance in order to obtain construction
permits as a contractor in the city.

            The
Hills confronted appellant at his home after learning that he had not paid any
fees to the city to obtain construction permits for their home.  Appellant
began crying when confronted

by the Hills,
and he pleaded for them not to contact the police.  He subsequently wrote a
letter of apology that read as follows:  

Letter
of Apology

To Kay Hill                                                                                                     
4/9/07

I would like to say
Mrs. Hill that I’m sorry for lieing [sic] to you about the city bond fee.  I’m
very sorry for charging you fees that were at all not necessary.  I’m sorry
because I know I hurt you emotionally and I feel bad cause you had to get out
of bed when you hurt to wait for us to come work.  I’m sorry for the days I
stood you up.  I promise not to lie to you or anybody else.  I promise to tell
the truth no matter what the facts are.  The truth will have to be told the way
it is. Once again Mrs. Hill, I’m sorry for all the pain and suffering I put you
through.  Thank you.  /s/ T.J. Lopez

 

Appellant
ultimately entered into an agreement with the Hills to pay back the $15,735.54
he collected for city fees and bonds at the rate of $14 a week.  He made five
payments under this arrangement, but he ceased making the payments after he was
arrested.

            Another
significant portion of the total payments in excess of $161,000 that the Hills made to appellant were personal loans to
appellant.  The Hills made loans in excess of $38,000 to appellant over the
course of their working relationship.  The Hills made these loans based upon
appellant’s statements to them regarding various financial difficulties that he
was purportedly encountering.

            The
State offered the testimony of Lance Friday, a local contractor, regarding the
necessity of many of the repairs suggested by appellant to the Hills.  He testified
that the attic trusses that appellant indicated needed to be repaired were not
defective because the house was properly framed when it was built. 
Additionally, he testified that appellant’s work on the trusses did not
strengthen them.  Friday additionally testified that the original foundation of
the Hills’ home was sufficient and that the additional footing that appellant
poured around the home did nothing to help support the structure.  He did not
observe any evidence of termite damage in the attic of the home.  He also did
not observe any problems with the chimney requiring the repairs to it that
appellant performed.  Friday additionally did not find that appellant installed
insulation in any significant amount in the house.

            During
the guilt/innocence phase, the State additionally called several other
individuals who had hired appellant for construction projects as witnesses to
testify about their experiences with appellant.  Their testimony is summarized
as follows:

·        
Paul West hired appellant in January 2007 to do brickwork on a
new home construction project.  He agreed to pay appellant $8,000 to brick the
home.  West paid appellant $5,000 to brick the home, but appellant only
completed approximately half of the work.  West entered into a separate contract
with appellant to do footings and brickwork on columns on the home for $2,000. 
West paid appellant the entire $2,000, but appellant did not do any of the
work.  Appellant told West that he would return the money that West advanced to
him for work that was not done, but appellant failed to do so.

 

·        
Robert Pfile’s wife hired appellant to perform electrical work on
two rent houses in February 2007.  The Pfiles met appellant a year earlier when
he came to their home offering to do brick repair.  He came to their home in
February 2007 offering to do the brick repair work a second time.  Appellant
informed them that he was a master electrician when in fact he was not.  Mr. Pfile
testified that his wife paid appellant $19,000 over the course of a week for
the work he agreed to perform in rewiring the rent houses.  Mr. Pfile testified
that appellant did very little work on the houses and that a qualified
electrician had to be hired to re-do the work that appellant had performed
because it did not comply with code requirements.  When confronted by Mr.
Pfile, appellant agreed to pay back $10,000, but he never did repay the money. 
Manuel Beltran, a detective with the Midland Police Department that has extensive
experience in the construction industry, testified that appellant did not
actually rewire the houses.  In many instances, appellant merely installed new
switches and electrical outlets to the original wiring in the houses.

 

·        
Maria Gabriela Ramos hired appellant in March 2007 to remove the
flat roof on her family’s home and replace it with a pitched roof. Appellant
also agreed to add a small room to the house and replace some windows. Appellant
agreed to do the work for a total of $13,500.  Ramos paid appellant $11,800
toward the agreed upon amount.  However, appellant only completed a small
portion of the project because he stopped working on the project after the
third day of work.  At the time that he stopped working on Ramos’s house, he
had only removed the flat roof that previously existed. Thus, appellant left
Ramos’s family with a house that did not have a roof. Appellant told Ramos that
he would give her one-half of her money back, but he never did.

 

·        
Perry Taylor hired appellant to perform some brickwork in March
2007.  He and appellant signed a written contract in the amount of $10,500 to
perform the work.  Taylor paid appellant all of the money, but appellant did
not perform all of the work required under the contract.  Taylor estimated that
appellant did not complete approximately $2,500 to $3,000 of the work that he
agreed to do.  Appellant agreed to perform additional work for Taylor at a cost
of $2,100.  Taylor paid appellant $2,100 for this work, but appellant did not
complete it.  Taylor also loaned appellant $1,500 to assist with jobs that
appellant was performing for other individuals.  However, appellant did not repay
the loan back to Taylor.

 

·        
In March 2007, Pat Magers’s contractor, Brent Bates, hired
appellant to demolish a structure.  Appellant performed the demolition work,
but he did not clean up the debris left by the demolition.  Appellant also
agreed to supply a heating/air conditioner system to Magers for a total cost of
$5,800.  Magers paid appellant $4,500 up front for the system equipment, but
appellant never delivered the system or paid the money back.  Appellant
subsequently paid Magers $1,000 of the $4,500 back.

 

·        
Roy Hearon hired appellant to paint his house in April 2007. 
Appellant agreed to perform the work for $1,800.  Hearon paid him $1,000 up
front, but 

appellant
neither painted his house nor returned the $1,000 that Hearon had paid him.

 

·        
Mark Ament hired appellant in March 2007 to build a garage for
the price of $15,000.  Ament paid appellant $2,000 up front for the project and
made  subsequent payments totaling $7,500, but appellant stopped working on the
project.  Ament noticed at the outset that appellant did not build the garage
in an acceptable manner.  Ament also testified that appellant lied to him about
obtaining the necessary construction permit.  Ament testified that appellant
agreed to return $2,500 of the money paid to him but that he never paid the
money back.

 

·        
Aloise Kuykendall hired appellant in March 2007 to paint and perform
grout work on her home for a total price of $5,412.  She paid appellant $3,412
up front for the work.  Some of appellant’s workers came to work on the project. 
Their work was unacceptable, and they did not complete the project.  Kuykendall
had to hire others to re-do their work.  Appellant did not refund any of the
money that Kuykendall paid him for the project.

 

Sufficiency of the Evidence

            Appellant
challenges the legal sufficiency of the evidence in his first issue.  To
determine if the evidence is legally sufficient, we must review all
of the evidence in the light most favorable to the verdict and determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319 (1979); Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); Jackson
v. State, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000).  When conducting a
sufficiency review, we consider all the evidence admitted at trial, including
pieces of evidence that may have been improperly admitted. Clayton v. State,
235 S.W.3d 772, 778 (Tex. Crim. App. 2007); Conner v. State, 67 S.W.3d
192, 197 (Tex. Crim. App. 2001); Garcia v. State, 919 S.W.2d 370, 378
(Tex. Crim. App. 1994); Chambers v. State, 805 S.W.2d 459, 460 (Tex. Crim.
App. 1991). The finder of fact is the sole judge of the weight and credibility
of the witnesses’ testimony. Tex. Code
Crim. Proc. Ann. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).  We
presume that the jury resolved conflicts in the evidence in favor of the
prosecution, and we defer to that determination in reviewing the sufficiency of the evidence. Jackson,
443 U.S. at 326.  

            Our
analysis of appellant’s challenge to the legal sufficiency of the evidence
focuses on a review of the mathematical calculations presented at trial.  As
noted previously, the Hills made payments in excess of $161,000 to appellant.  The
jury convicted appellant of second degree theft of between $100,000 and
$200,000.  See Tex. Penal Code
Ann. § 31.03(e)(6) (Vernon Supp. 2009).  Accordingly, we must determine
if any rational trier of fact could have found beyond a reasonable doubt that
appellant committed theft against the Hills in an amount of at least $100,000. 


            A person commits theft “if he unlawfully appropriates property with intent
to deprive the owner of property.” Tex.
Penal Code Ann. § 31.03(a) (Vernon Supp. 2009).  Appropriation of
property is unlawful if it “is without the owner’s effective consent.” Tex. Penal Code Ann. § 31.03(b)(1)
(Vernon Supp. 2009); Stewart v. State, 44 S.W.3d 582, 589 (Tex. Crim. App.
2001) (the “crucial element of theft is the deprivation of property from the
rightful owner, without the owner’s consent”). “Consent” is not effective if it
is induced by deception. See Tex.
Penal Code Ann. § 31.01(3)(A) (Vernon Supp. 2009).   The Texas Penal
Code defines “deception” as follows:

 “Deception” means: 

 

            (A)
creating or confirming by words or conduct a false impression of law or fact
that is likely to affect the judgment of another in the transaction, and that
the actor does not believe to be true; 

 

            (B)
failing to correct a false impression of law or fact that is likely to affect
the judgment of another in the transaction, that the actor previously created 

or confirmed by
words or conduct, and that the actor does not now believe to be true; 

 

            (C)
preventing another from acquiring information likely to affect his judgment in
the transaction; 

 

            (D)
selling or otherwise transferring or encumbering property without disclosing a
lien, security interest, adverse claim, or other legal impediment to the
enjoyment of the property, whether the lien, security interest, claim, or
impediment is or is not valid, or is or is not a matter of official record; or 

 

 

            (E)
promising performance that is likely to affect the judgment of another in the
transaction and that the actor does not intend to perform or knows will not be
performed, except that failure to perform the promise in issue without other
evidence of intent or knowledge is not sufficient proof that the actor did not
intend to perform or knew the promise would not be performed. 

 

Tex. Penal Code Ann. § 31.01(1)(A)-(E)
(Vernon Supp. 2009).   Thus, the Penal Code provides five alternative methods
of committing theft by deception.  

            Appellant
focuses his legal sufficiency challenge on the method of deception set out in
Section 31.01(1)(E).  This subsection provides that an actor engages in
deception if he promises performance that he does not intend to perform or
knows will not be performed.  Most theft convictions resulting from contractual
civil disputes arise under this “failure to perform” subsection.  In the typical
scenario, the actor agrees to perform a service, accepts money for the service,
but then ultimately fails to perform the service.  A claim of theft in this
situation requires proof of more than an intent to deprive the owner of
property and subsequent appropriation of the property. Baker v. State,
986 S.W.2d 271, 274 (Tex. App.—Texarkana 1998, pet. ref’d). “If no more than
intent and appropriation is shown in a contract claim, nothing illegal is
apparent, because under the terms of [a contract] individuals typically have
the right to ‘deprive the owner of property,’ albeit in return for
consideration.” Id.  Stated another way, if money was voluntarily given
to the accused pursuant to a contractual agreement and there is insufficient
evidence in the record to show the money was obtained by deception, the
conviction cannot stand. Phillips v. State, 640 S.W.2d 293, 294 (Tex. Crim.
App. 1982).  Thus, to constitute theft in a contract situation, the evidence
must show that the accused intended to deprive the owner of the money advanced
under the contract at the time the money was accepted by the accused. See
Wilson v. State, 663 S.W.2d 834, 836-37 (Tex. Crim. App. 1984) (“Relevant
intent to deprive the owner of property is the accused’s intent at the time of
the taking.”).  

            Texas
courts have held that, if a contract is partially or substantially performed,
then the intent to commit theft through deception is not shown by the evidence.
See Baker, 986 S.W.2d at 275.  Appellant relies on this principle
to assert that the evidence negates his culpability for theft by deception
because he partially performed his agreement to work on the Hills’ home.  We agree
that an actor’s partial performance under a contract may negate his criminal culpability
in the context of the “failure to perform” ground of deception.  As set out
above, however, Section 31.01(1) lists additional grounds by which an
actor may commit theft by deception. 

            Section
31.01(1)(A) provides that an actor engages in deception by “creating or
confirming by words or conduct a false impression of law or fact that is likely
to affect the judgment of another in the transaction, and that the actor does
not believe to be true.”  The State relied heavily upon this ground for
establishing appellant’s guilt for theft by deception.[3] 
For example, appellant represented to the Hills that they owed thousands of
dollars in fees and bonds to the City of Midland in order for the construction
project to occur.  As evidenced by his letter of apology to Mrs. Hill,
appellant created a false impression of law or fact that he knew was not true
that induced the Hills to pay him $15,735.54 for the bogus fees.  The fact that
appellant may have partially performed under the contract is irrelevant to an
inquiry as to whether he acquired funds from the Hills without their effective
consent by creating a false impression of law or fact.  Accordingly, we
conclude that evidence of partial performance under a contract is not relevant
to a charge that an actor induced the property owner’s consent to advance funds
under a contract by creating a false impression of law or fact.  

            As
noted previously, the State offered evidence that many of the alleged flaws
that appellant identified to the Hills with their home were not defective or
deficient.  These items included the purported problems with the Hills’
chimney, foundation, attic trusses, and termite damage.  The State contends
that appellant’s work on these items constituted unnecessary repairs and that
the amounts that appellant charged the Hills for these unnecessary repairs were
obtained by deception.  We conclude that a rational trier of fact could have
found beyond a reasonable doubt that appellant induced the Hills to advance
funds to him for these unnecessary repairs by creating a false impression of
law or fact regarding their necessity.  Detective Bill Anderson, another Midland
police officer with construction experience, testified that appellant charged
the Hills $27,425 for work done on the chimney;[4]
$8,219 for the foundation work; and $18,300 for work done in the attic for
trusses, alleged termite damage, and insulation.  Thus, the State offered
evidence that appellant charged the Hills $53,644 for unnecessary repairs.  

            In
addition to the $15,735.54 that appellant collected from the Hills for bogus
permit fees and the $53,644 he charged them for unnecessary repairs, he also
borrowed $38,945.79 in personal loans from them.  Appellant informed the Hills
of various financial problems he was having when he obtained these loans.  Mr. Hill
testified that appellant told him that his bookkeeper/accountant had stolen
money from him and fled to the Cayman Islands.  Mr. Hill described the
conversations leading up to appellant asking for loans as follows:

Usually he would
come in and say, you know “I’m really short on cash because my accountant has
cleaned out my account; my funds are tied up; that the bank would not loan me
any more money until we -- this was resolved.” It was all in the process.  I
believe what he said was his accountant had been arrested, and that a good bit
of the money that he had taken from Mr. Lopez and others, had been found -- or
at least the Court had managed to turn up a bunch of it; and it was all sitting
in the Court Clerk’s hand; and eventually they were going to sort it all out as
to how much would be proportioned out to certain people that were all victims. 


 

            And so
it was going to be tied up for a while, and he needed something to tide him
over until then.  

 

Appellant also
stated that he needed money to complete projects for other customers and that
he needed money to re-incorporate his business.  Detective Anderson determined
that appellant’s story about his accountant was a sham.  Additionally, the
testimony from appellant’s other customers with regard to funds they advanced
to him for projects demonstrated that he was not in dire financial straits. 
Accordingly, a rational trier of fact could have found beyond a reasonable
doubt that appellant induced the Hills to loan money to him by creating a false
impression of law or fact regarding his financial difficulties and its causes.

            Additionally,
Mrs. Hill testified that she paid appellant $2,100 for Pella windows and $1,000
for a credenza that he never delivered.  She also testified that twenty-five
percent of the work that appellant agreed to complete remained unfinished.  The
testimony of appellant’s other customers reveals a pattern of conduct on his
part to agree to perform work with no intention of completing it.  Based upon
their testimony, a rational trier of fact could have found beyond a reasonable
doubt that appellant did not intend to deliver the windows and credenza or
complete the work he agreed to perform at the time he accepted funds for these
projects from the Hills.  Accordingly, the record contains legally sufficient
evidence to support the jury’s determination that appellant committed theft by
deception against the Hills in an amount in excess of $100,000.  Appellant’s
first issue is overruled.

Evidence
of Appellant’s Dealings with Other Customers

            In
his second and third issues, appellant challenges the admission of evidence
pertaining to his dealings with other customers.  He contends in his second
issue that the admission of this evidence violated Tex. Penal Code Ann. § 31.03(c)(1) (Vernon Supp. 2009).  He
asserts in his third issue that the admission of this evidence violated Tex. R. Evid. 404(b).  We review the
trial court’s ruling on the admissibility of evidence under an abuse of
discretion standard. Powell v. State, 63 S.W.3d 435, 438 (Tex. Crim. App.
2001); Montgomery v. State, 810 S.W.2d 372 (Tex. Crim. App. 1991). This
standard requires an appellate court to uphold a trial court’s admissibility
decision when that decision is within the zone of reasonable disagreement.  Powell,
63 S.W.3d at 438.

            Section
31.03(c)(1) provides that “evidence that the actor has previously participated
in recent transactions other than, but similar to, that which the prosecution
is based is admissible for the purpose of showing knowledge or intent and the
issues of knowledge or intent are raised by the actor’s plea of not guilty.”  Appellant
asserts that another transaction must be identical to the charged offense in
order to be admissible under the statute.  We disagree.  The statute only
requires that another transaction be similar to the charged offense in order to
be admissible.  We conclude that the trial court did not abuse its discretion
in determining that the other transactions, which all occurred during the
period of time that appellant was also working on the Hills’ home, were similar
to the transaction giving rise to the charged offense.  Appellant’s second
issue is overruled.

            Evidence
of other crimes, wrongs, or bad acts is not admissible for the purpose of
showing that the person acted in conformity therewith. Rule 404(b); Montgomery,
810 S.W.2d at 386-88. However, this evidence may be admissible when it is
relevant to a “noncharacter conformity fact of consequence in the case,” such
as intent, motive, identity, opportunity, preparation, plan, knowledge, or
absence of mistake or accident. Powell, 63 S.W.3d at 438; see
Rule 404(b); Montgomery, 810 S.W.2d at 387-88. Admissibility of evidence
hinges on the relevancy of the evidence to a “fact of consequence” in the case.
Rankin v. State, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996). Other
crimes, wrongs, or bad acts have noncharacter conformity relevance where it
logically serves to make less probable defensive evidence that undermines an
elemental fact. Powell, 63 S.W.3d at 438.

            We
conclude that the trial court did not err under Rule 404(b) in admitting the
other customers’ testimony.  The evidence was admissible under both Section
31.03(c)(1) and Rule 404(b) to show appellant’s intent.  In a theft case
arising from a construction contract, the issue of the defendant’s intent at
the time he received funds under the contract in consideration of his promise
to perform future work will invariably be a contested issue at trial.  The
evidence from the other customers showed that appellant took money for work
that he never intended to complete.  Appellant’s third issue is overruled.

Disabled
Juror

       In his fourth issue, appellant
contends that the trial court erred in proceeding with the trial over his
objection after a juror
became ill. Appellant claims that the trial court erred
in determining that the juror was disabled under Tex. Code Crim. Proc. Ann. art.
36.29(a) (Vernon Supp. 2009).  On the third day of trial,
the proceedings began with the trial court informing the attorneys that a juror
had contacted the court to report that she was ill with a stomach ailment and
that she would not be able to attend court.  The trial court additionally
advised the parties that the same juror had informally advised the court on the
previous day that she had an upset stomach and was not feeling well.  Although
appellant objected and requested that the trial be postponed,
the trial court chose to proceed under Tex. Code Crim. Proc. Ann. art.  36.29
(Vernon Supp. 2009).  Prior to making its determination to proceed with eleven
jurors, the trial court polled the remaining jurors to ascertain their
availability in the event the trial was postponed.  Six of the remaining jurors
indicated it would be difficult for them to come back at a later date, and all
eleven of the remaining jurors indicated that they would like for the trial to
continue without waiting for the return of the sick juror.

            Article
36.29 allows a trial to proceed with fewer than twelve jurors
if a juror becomes disabled.  A juror is disabled if he has a physical
illness, mental condition, or emotional state that hinders his ability to
perform his duties as a juror. Hill v. State, 90
S.W.3d 308, 315 (Tex. Crim. App. 2002); Landrum v. State, 788 S.W.2d
577, 579 (Tex. Crim. App. 1990). A disability for
purposes of Article 36.29 includes any condition that
inhibits a juror from fully and fairly performing the
functions of a juror. Routier v. State, 112 S.W.3d
554, 588 (Tex. Crim. App. 2003).  The determination as to whether a juror is disabled lies within the
sound discretion of the trial court.  Brooks v. State, 990 S.W.2d 278,
286 (Tex. Crim. App. 1999). Absent an abuse of that discretion, no reversible
error will be found.  Id.

            Appellant contends
that an upset stomach is insufficient to render a juror disabled because such an illness is
temporary. However, other courts have found that jurors
who complained of other temporary illnesses that impaired
their ability to perform the functions of a juror were
properly determined by the trial court to be disabled. See
Allen v. State, 536 S.W.2d 364, 366-67 (Tex. Crim. App. 1976) (juror properly determined to be disabled
after having been diagnosed with influenza); Hughes v. State, 787 S.W.2d
193, 195 (Tex. App.—Corpus Christi 1990, pet. ref’d) (juror
excused after complaining of nausea, headaches, and vomiting).  A juror’s inability to come to the courthouse due to a stomach
ailment provides some
evidence of the requisite incapacity to perform the duties assigned to that juror that the trial court may consider
in making a determination of disability. Although some
stomach ailments might be only temporary, it remains within the trial court’s
discretion to determine whether the juror had become disabled. Therefore, the record does establish that the trial
court abused its discretion in determining that the juror’s
ailment rendered her disabled.  Furthermore, Article
36.29 does not require the trial court to consider postponing the trial prior
to proceeding with eleven jurors in the event of a juror’s disability.  Thus, the
remaining jurors’ preference for proceeding with the trial is of no consequence
to a disability determination under Article 36.29.  Appellant’s fourth issue is
overruled.

This Court’s Ruling

 

            The judgment of the
trial court is affirmed.

 

 

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

April 15, 2010

Publish.  See Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J., 

McCall, J., and
Strange, J.









                [1]The items charged
by appellant for fees and bonds consisted of the following:  (1) City
Construction Bond - $2,500; (2) Footing Fee - $343.85; (3) City Environmental
Fee - $426; (4) City Bond to Repair Chimney - $1,500; (5) Fee Curb Cut -
$375.69; (6) Bond Curb Cut - $1,500; (7) City Bond to Rebuild Chimney - $1,975;
(8) Gas Line Inspection - $900; (9) City Environmental Fee - $225; (10) Curb
Cut Fine - $1,320; (11) Chimney Bond Renewal - $3,870; and (12) Additional Bond
for Chimney - $800.

 





                [2]Schwope testified that appellant was only required to
obtain a single building permit for the work to be performed on the Hills’ home
at a cost of $5.25 per each $1,000 of the cost of construction and to pay a
single curb cut fee of $25.   





                [3]The court’s charge included the methods of perpetrating
deception set out in Section 31.01(1)(A), (B), (C), and (E) in its definition
of “[d]eception.”

 





                [4]In
addition to charging the Hills $27,425 for unnecessary repairs to their
chimney, he also collected $8,145 from them for bogus permit fees for the work
on the chimney.